In re Curtis R. CATRON.

Curtis R. CATRON, Plaintiff/Appellant,

v.

Nancy L. CATRON, Defendant/Appellee.

Bankruptcy No. 91–25827–T.

United States District Court,
E.D. Virginia,
Norfolk Division.

Jan. 21, 1994.

Frank J. Santoro, Joseph T. Liberatore, Marcus, Santoro & Kozak, Portsmouth, VA, for plaintiff/appellant.

Jerrold G. Weinberg, Cecelia Ann Weschler, Weinberg & Stein, Norfolk, VA, for defendant/appellee.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge:

Curtis R. Catron, a debtor in a Chapter 11 bankruptcy proceeding, appeals from a final order of the Bankruptcy Court that an obligation contained in a Final And Permanent Separation, Support and Property Agreement (the "Settlement Agreement"), which was confirmed in a Final Decree of Divorce, was "in the nature of alimony, maintenance or support" and therefore not dischargeable in bankruptcy pursuant to 11 U.S.C.A. § 523(a)(5). For the reasons set forth below, the decision of the Bankruptcy Court is affirmed.

## STATEMENT OF FACTS

Curtis R. Catron ("Mr. Catron") and Nancy L. Catron ("Mrs. Catron"), now Nancy L. Morrison, were married for twenty-six years. With the exception of approximately nine months at the beginning of their marriage, Mrs. Catron did not work outside the home. During the marriage, Mr. Catron had significant real estate investments. He also ran an insurance business with varying degrees of success over the years. The Bankruptcy Court found that Mr. Catron had access to significant resources which allowed him and Mrs. Catron to live comfortably, or perhaps lavishly, during the course of their marriage. In May 1989, Mr. and Mrs. Catron separated, and Mr. Catron instituted divorce proceedings, alleging that Mrs. Catron had committed adultery. She responded by filing a cross-bill, alleging that Mr. Catron was guilty of adultery. In the Spring of 1990 the parties, through their counsel, began serious settlement negotiations and, on July 30, 1990, the parties entered the Settlement Agreement, which was incorporated in the Final Decree of Divorce on August 21, 1990. Paragraph 2 of that agreement is the focal point of this appeal. In pertinent part, it provides:

> Husband shall pay directly to Wife, *as and for spousal support, alimony and maintenance,* the (a) lump sum of $900,000 payable (i) $300,000 by the 1st day of July, 1995, and (ii) $300,000 by the 1st day of July, 2000, and (iii) $300,000 by the 1st day of July, 2005, and (b) periodic sum of $2,500 monthly for 180 months, ... but both being subject to automatic termination upon the death of Wife or payment in full of the lump sum spousal support and all periodic spousal support ...

(emphasis added). Other sections of the Settlement Agreement also make reference to the spousal support obligations provided in Paragraph 2. Perhaps the most significant of those references is found in Paragraph 4 of the Settlement Agreement, wherein Mr. and Mrs. Catron agreed that:

> ... *it is their mutual intent* and bargain, which goes to the very essence of this entire agreement, that the monetary payments, obligations, and liabilities assumed and set forth herein for the benefit of the parties, respectively, *including spousal support, whether lump sum or periodic, ... shall be considered, for the purposes of federal bankruptcy law, exempt from discharge and non-dischargeable in bankruptcy as debts to a spouse or former spouse as being in the nature of alimony, maintenance or support* as the debts, liabilities and obligations created by this agreement are intended for economic security, after considering many facts, circumstances and factors ...

(emphasis added). The "facts, circumstances and factors" considered by the parties included: (1) the disparity of the parties' earning power; (2) business opportunities available to the parties; (3) the financial circumstances and needs of each party; (4) the parties' respective levels of education; (5) the physical and mental health of the parties; (6) the probable need of the parties for future support; (7) the level of fault of each party in bringing about the divorce; (8) the duration of the marriage; (9) the loss of benefits which would have accrued had the marriage continued; and (10) the adequacy of support absent the terms of the agreement. These factors are those required to be considered by a court in making a determination of the need for, and amount of, spousal support under Virginia law. *See,* Va.Code § 20-107.1.

On October 17, 1991, Mr. Catron, who was facing cash flow difficulties, a foreclosure of

his residence and suits by creditors filed a petition for reorganization under Chapter 11 of the Bankruptcy Act. Notwithstanding the unambiguous terms of Paragraphs 2 and 4 of the Settlement Agreement, Mr. Catron filed a Complaint to Determine the Dischargeability of Debt, contending that the debt created by Paragraph 2 of the Settlement Agreement was not within the exception to discharge created by 11 U.S.C. § 523(a)(5). The statute provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> > (5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree, or property settlement agreement, but not to the extent that—
> >
> > (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support;

Mr. Catron argued to the Bankruptcy Court that, notwithstanding the clear language to the contrary in the Settlement Agreement which he signed with the advice of counsel, he never actually intended to agree to make support payments to Mrs. Catron because he had an unassailable adultery claim pending in the divorce proceedings. He also advanced the related contention that the structure of the Settlement Agreement revealed that the support obligations provided therein were not what they purported to be, but were instead components of a property settlement. Accordingly, Mr. Catron asserted that the provisions of Paragraph 2 of the Settlement Agreement created a debt which is not exempt from discharge under 11 U.S.C. § 523(a)(5) because the debt is not "actually in the nature of alimony, maintenance, or support."

After hearing the evidence, the Bankruptcy Court found that Mr. Catron's debt to Mrs. Catron was not dischargeable under 11 U.S.C.A. § 523(a)(5). In its oral findings of fact and conclusions of law, the Bankruptcy Court noted first that the proper test for whether payments are in the nature of alimony, maintenance, or support is whether it is the parties' shared intent that the payments are for the purpose of support rather than a property settlement. It then applied the four factor analysis outlined in *Kettner v. Kettner,* No. 91–587–N, 1991 WL 549386 (E.D.Va. Nov. 19, 1991) to determine whether Mrs. Catron had proved the existence of mutual intent, and held that it was Mr. and Mrs. Catron's mutual intent that the payments were for support. Subsequently, the Bankruptcy Court issued a memorandum opinion which was entered on September 23, 1992, 164 B.R. 908. This appeal followed.

### DISCUSSION

The issues in this appeal are to be decided in light of the appropriate standard of review. The findings of fact made by the Bankruptcy Court, such as the intent of the parties, are subject to review by the district court for clear error. Fed.R.Bankr.Proc. 8013; *Gianakas v. Gianakas,* 917 F.2d 759, 762 (3rd Cir.1990). *Accord Tilley v. Jessee,* 789 F.2d 1074, 1075 (4th Cir.1986). Questions of law, which include the identification of the factors to be considered in determining the intent of the parties, are subject to plenary review. *Gianakas,* 917 F.2d at 762; *In re Bialac,* 712 F.2d 426 (9th Cir.1983).

On appeal, Mr. Catron contends that the Bankruptcy Court's decision suffers from four defects, two of which pertain to the burden of proof on the issue of dischargeability and two of which pertain to the substance of the Bankruptcy Court's decision.

### I. The Burden of Proof Issues

Mr. Catron first asserts that the Bankruptcy Court, having determined that "the language of the marital settlement agreement was clear in designating [the] debt as in the nature of alimony, support and maintenance," then erroneously shifted the burden of proof from Mrs. Catron to Mr. Catron. He also makes the related argument that, "after shifting the burden of proof to the debtor," the Bankruptcy Court misapplied the principles announced in *Tilley v. Jessee* and, in so doing, erroneously required Mr.

Catron to overcome a "substantial obstacle" in showing that the debt was non-dischargeable. Neither of these related contentions have merit.

■ Discharge being favored by the Bankruptcy Code, the party objecting to the discharge of a debt has the burden of proving that the debt is non-dischargeable. In this case, that means that Mrs. Catron must prove that "the obligation at issue is actually in the nature of alimony, maintenance or support." *Tilley v. Jessee,* 789 F.2d at 1077. *See also* Bankruptcy Rule 4005. The standard of proof is preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Federal law, not state law, controls whether a debt is in the nature of support and hence non-dischargeable. *Long v. West (In re Long),* 794 F.2d 928, 930 (4th Cir.1986). This, however, does not mean that state law is entirely irrelevant because state law may be helpful in understanding the agreement.

■ Mr. Catron's argument that the Bankruptcy Court shifted the burden of proof to him is based on the following language of the Bankruptcy Court's Memorandum Opinion:

> ... the clear and unambiguous language of intent in the agreement establishes a prima facie case that the debt owed Mrs. Catron is non-dischargeable. Furthermore, the strength and clarity of the agreement 'erects a substantial obstacle' to the debtor's ability to rebut this prima facie case. *Tilley,* 789 F.2d at 1078. Notwithstanding this conclusion, the court has afforded the debtor an ample opportunity

to rebut or explain the language in the agreement.

164 B.R. at 912. Neither this language nor any other aspect of the record supports the argument that the Bankruptcy Court misunderstood or misapplied the rules respecting the burden of proof.

It is clear from the Bankruptcy Court's verbal decision and its written opinion that the Bankruptcy Court correctly articulated the burden of proof and then applied it to the evidence presented at trial.[1] Mr. Catron appears to have confused shifting the burden of producing evidence with shifting of burden of persuasion.[2] The Bankruptcy Court simply found that Mrs. Catron had established a prima facie case and, having done so, provided Mr. Catron the opportunity to "rebut or explain" the language in the agreement. 164 B.R. at 912. This did not shift to Mr. Catron the burden to prove that the debt was dischargeable.

The thrust of Mr. Catron's argument is that, notwithstanding its clear recognition of the burden of proof, the Bankruptcy Court misapplied *Tilley* by holding "... that since [the Settlement Agreement] was clear on its face ... [sic] the burden of proof must shift to the debtor." (Appellants Opening Brief, p. 14). The basis for this argument appears to be the following language in the Bankruptcy Court's written opinion: "... the clear and unambiguous language of intent in the agreement establishes a prima facie case that the debt owed Mrs. Catron is non-dischargeable." 164 B.R. at 912.

Mr. Catron's argument is flawed: nothing in *Tilley* precludes a finding that the text of

---

1. The allocation of the burden of proof made by Judge Tice both verbally and in his written opinion could not be more clear. First, in making his oral findings of fact and conclusions of law from the bench, Judge Tice, citing *Tilley v. Jessee,* stated that "a party challenging the dischargeability of a debt in bankruptcy ... has a burden of establishing that the debt is actually in the nature of alimony, maintenance or support and, therefore, nondischargeable. That's the language of the code section."

In his written opinion, Judge Tice repeated this test, citing *Bulman v. Bulman (In re Bulman),* 123 B.R. 24, 26 (Bankr.E.D.Va.1990) and Bankruptcy Rule 4005 for the proposition that "the burden of proof is on the party challenging the

discharge to prove by a preponderance of the evidence that the debt should be declared non-dischargeable."

2. A number of courts have held that once the party objecting to discharge establishes a prima facie case that the debt is not dischargeable, the burden of coming forward to rebut the prima facie case shifts to the debtor. *See, e.g., Davidson v. Davidson (In re Davidson),* 104 B.R. 788, 797–98 (Bankr.N.D.Tex.1989); *Daviau v. Daviau (In re Daviau),* 16 B.R. 421, 424 (Bankr.D.Mass. 1982); *Aiken v. Ingram (In re Ingram),* 5 B.R. 232, 234 (Bankr.N.D.Ga.1980). The ultimate burden of persuasion at all times remains on the party objecting to discharge.

an agreement can provide sufficient evidence of mutual intent to constitute a prima facie case. Not only was the Court in *Tilley* not faced with an agreement which contained an unambiguous statement of mutual intent, *Tilley* did not even reach the issue whether such an unambiguous agreement could constitute a prima facie case. Rather, the Court in *Tilley* addressed only whether such an agreement, standing alone, could be determinative of mutual intent. *Tilley,* 789 F.2d at 1078. Thus, the Bankruptcy Court's finding here that the Settlement Agreement so clearly expressed the mutual intent of the parties that it constituted a prima facie case is in no way inconsistent with *Tilley.* Moreover, Mr. Catron has cited no decisional law which would preclude such a finding. Nor does any principle of law known to the court require, or even support, the result advanced by Mr. Catron. If the parties to an agreement are willing to set forth clearly, and to acknowledge in writing, the mutual intent which they hold in making an agreement, the courts, in interpreting that agreement, must take them at their word, unless the remainder of the text of the agreement reveals a reason not to do so. That is particularly true where, as here, the parties were represented by competent counsel and incorporated their agreement into a court order. To do otherwise would invite profound mischief and encourage parties to divorce proceedings and their counsel to make agreements that do not reflect their true intent or, worse still, that they do not intend to keep.

Mr. Catron's second and related assertion, that the Bankruptcy Court imposed on him a "substantial obstacle" standard, is based on the same passage from the Bankruptcy Court's written opinion, but focuses on the description of the Settlement Agreement as presenting a "substantial obstacle" to rebutting the prima facie case created by the clear language of the Settlement Agreement.

Like Mr. Catron's first argument, this one also misapprehends the Bankruptcy Court's opinion. That opinion first set forth the facts of *Tilley v. Jessee,* the source of the "substantial obstacle" language, and then observed that in *Tilley* the spouse challenging the discharge "was faced with a written

agreement that was clearly and unambiguously a property settlement." 164 B.R. at 911. The Bankruptcy Court also correctly stated that the Court of Appeals in *Tilley* held that the clear, unambiguous language of the written instrument "erected a substantial obstacle which ... [*the non-debtor spouse* ] was required to overcome." (*Id.,* citing *Tilley* at 1078.) Then, finding that the Catron's Settlement Agreement "clearly and unambiguously states that the mutual intention of the parties was to provide for 'alimony, maintenance, and support,'" the Bankruptcy Court gave the Catron's Settlement Agreement the same effect as the Court of Appeals accorded the agreement in *Tilley:* that the clear language of the agreement erected a substantial obstacle to be rebutted by the challenger of the language.

Mr. Catron asserts that the Bankruptcy Court erred in applying the "substantial obstacle" language to him, the debtor in this action, because in *Tilley* the substantial obstacle standard was imposed on the non-debtor spouse, who already had the burden of persuasion. In essence, Mr. Catron's contention is that a carefully drafted, clearly worded agreement should pose a "substantial obstacle" only to non-debtors, rather than to both parties in a bankruptcy proceeding.

■ This argument misapprehends the teaching of *Tilley.* *Tilley* instructs that, depending upon its clarity, the language of the parties' agreement plays a significant, although not necessarily dispositive, role in determining the mutual intent of the parties. In *Tilley,* the clear and unambiguous language of the agreement strongly suggested that the parties intended the agreement to be a property settlement. It is consistent with both the letter and the spirit of *Tilley* that, if the language of an agreement is sufficiently clear, it can create a substantial obstacle to the ability of the debtor to overcome a prima facie case, just as in *Tilley,* the language of the agreement imposed a substantial obstacle to the objecting party's ability to satisfy the burden of persuasion. To hold otherwise, as Mr. Catron asks this court to do, would compel the illogical, and legally indefensible, result that greater weight would be accorded to the clear language of a docu-

ment, depending upon which party, the debtor or non-debtor, has the burden of proof. Mr. Catron cites no authority for that proposition and the court declines to adopt it.

Moreover, Mr. Catron's arguments respecting the burden of proof ignore what really happened at trial. Mr. Catron first offered evidence and then Mrs. Catron presented her case. Thus, the Bankruptcy Court actually made its verbal decision in perspective of all the evidence and, in fact, made reference to the evidence at some length in making the analysis spelled out by *Kettner*. The Bankruptcy Court's written opinion also reflects that its decision was made on the basis of all the evidence. Hence, the record shows clearly that the Bankruptcy Court neither shifted the burden of proof to Mr. Catron nor erred in applying the "substantial obstacle" analysis suggested by *Tilley*.

## II. The Dischargeability Of The Debt

Mr. Catron's two remaining assignments of error are also interrelated. First, he asserts that the Bankruptcy Court applied an erroneous legal standard to determine whether the debt arising from the Settlement Agreement was actually "in the nature of alimony, maintenance, or support" as required by 11 U.S.C. § 523(a)(5)(B). Second, he argues that the Bankruptcy Court reached the mistaken factual conclusion that the parties mutually intended that the debt was for the purpose of alimony, maintenance, or support.

### A. The Legal Standard

■ It is difficult to discern why Mr. Catron believes that the Bankruptcy Court applied an improper legal standard to determine whether the challenged debt was dischargeable because the point is advanced without analysis or citation of authority. However, it appears that Mr. Catron's contention is that dischargeability of a debt in the nature of support should not turn on the mutual intent of the parties, but upon "the function the debt served at the time of the agreement." (Brief of Appellant, pp. 18–22).

In advancing this assertion, Mr. Catron correctly acknowledges that in determining the actual nature of the debt, the courts consider both the mutual intent of the parties and the function the debt served at the time of the agreement. However, he then baldly asserts that our Court of Appeals has "merged these two factors by focusing on" the latter one. The decisions of the United States Court of Appeals for the Fourth Circuit do not support this argument. In *Melichar v. Ost*, 661 F.2d 300, 303 (4th Cir.1981), the Court of Appeals stated: "[t]he proper test of whether payments are alimony lies in proof of whether it was the intention of the parties that the payments be for support rather than as a property settlement."[3] More recently in *Tilley v. Jessee*, our Court of Appeals, recognizing that the ultimate issue was whether the debt was actually in the nature of support, held that the resolution of that ultimate issue turned on the mutual or shared intent of the parties. 789 F.2d at 1077–78. Therefore, in analyzing the Catron's Settlement Agreement and the circumstances surrounding the production and endorsement of the Agreement to ascertain the mutual intent of the parties, the Bankruptcy Court performed the proper inquiry.

### B. Is The Debt Dischargeable?

To resolve Mr. Catron's final assignment of error—that the Bankruptcy Court erroneously concluded that the parties mutually intended for the agreement to be in the nature of alimony or support—the court must review the Bankruptcy Court's individual findings of fact on the issue of mutual intent.

■ Mr. Catron correctly observes that, notwithstanding the frequent consideration of the issue whether a debt arising from a marital settlement agreement is in the nature of support, there is no uniformly accepted calculus to make the determination of whether such debts are dischargeable. In making its determination, the Bankruptcy Court relied principally on the articulation of factors set forth in *Kettner v. Kettner*, No. 91–587–N, 1991 WL 549386 (E.D.Va. Nov. 19,

---

**3.** Significantly, in *Melichar*, the Court of Appeals was reviewing an agreement which set forth a hybrid method of spousal support combining elements of two methods of support neither of which, standing alone, would qualify as alimony under applicable state law.

1991), wherein Judge Clarke thoughtfully enumerated and analyzed the four factors that appear, in one way or another, in most decisions which address the issue.

The first factor to be considered is the actual substance and language of the agreement, which includes:

> [w]hether an agreement is labelled "property settlement" or "support agreement," the form of the payments (i.e. whether payments are monthly or in one lump sum), whether payments are made directly to the spouse, whether payments terminate on the death of the spouse, whether the document treats the provision as a support agreement for tax purposes, and whether the agreement is drafted by an attorney and is well structured with separate provisions detailing spousal support and property rights ... The label assigned to a particular payment is a significant factor, but not controlling ... Where there is a well structured drafting that purports to deal with separate issues in totally distinct segments of the document, a party with the burden of proving non-dischargeability must overcome a substantial obstacle in respect to those segments that purport to deal with a property settlement.

*Kettner v. Kettner*, No. 91–587–N, slip op. at 2–3 (E.D.Va. Nov. 19, 1991) (*citing In re Long*, 794 F.2d 928 (4th Cir.1986); *Tilley v. Jessee*, 789 F.2d 1074 (4th Cir.1986); *In re Gianakas*, 917 F.2d 759 (3rd Cir.1990); *In re Grijalva*, 72 B.R. 334 (Bankr.S.D.W.Va.1987); *In re Goodman*, 55 B.R. 32 (Bankr.D.S.C. 1985)).

The second factor is the financial situation of the parties at the time of the agreement. When considering this factor:

> [t]he court should consider such factors as whether one spouse was employed in a less remunerative position than the other, the stability of income of the spouses (i.e. whether the spouse earns a straight salary or whether the salary is comprised of a salary and a bonus that fluctuates), and whether one spouse has custody of the other spouse's minor children ...

*Kettner*, slip op. at 3 (*citing In re Gianakas*, 917 F.2d at 763; *In re Grijalva*, 72 B.R. at 336; *Shaver v. Shaver*, 736 F.2d 1314 (9th Cir.1984)).

The third factor enumerated in *Kettner* is the function served by the obligation at the time of the agreement:

> An agreement that serves to provide such daily necessities as food, clothing, shelter, and transportation is indicative of debt intended to be in the nature of support.... The court may consider such factors as the length of the marriage, the standard of living during the marriage, and any periods of separation during the marriage.... The court may also examine the statements of the spouses in determining the purpose for which payments are intended.

*Kettner*, slip op. at 3–4 (*citing In re Gianakas*, 917 F.2d at 763; *In re Grijalva*, 72 B.R. at 336; *In re Yeates*, 807 F.2d 874 (10th Cir.1986); *In re Stone*, 79 B.R. 633 (Bankr. D.Md.1987), *appeal dismissed*, 98 B.R. 243 (D.Md.1988)).

The final factor articulated by *Kettner* is whether there is any evidence of overbearing at the time of the agreement that should cause the court to question the intent of a spouse.

> In determining whether a spouse's will has been overborne, the court should consider whether both parties were represented by an attorney, whether the terms of the agreement grossly favor one spouse over the other or leave one spouse with virtually no income, the statements of the spouses in court, the age, health, intelligence and experience of the spouses, the bargaining positions of the parties, whether there were any misrepresentations, and whether the creditor spouse had knowledge of the debtor spouse's weakness or inability to fulfill the terms of the agreement.

*Kettner*, slip op. at 4.

The decision in *Kettner* provides a sound and effective framework for a Bankruptcy Court to determine the mutual intent of the parties. There was no error in using that framework here.

■ The Bankruptcy Court's written opinion focuses explicitly on only one of the four factors set forth in *Kettner*. Specifically, it discusses the terms of the Settlement Agreement, observing that:

[T]he agreement in this case clearly and unambiguously states that the intention of the parties was to provide for "alimony, maintenance, and support." Adherence to *Tilley v. Jessee* in this case compels the court to conclude that the clear and unambiguous language of intent on the agreement establishes a prima facie case that the debt owed to Mrs. Catron is non-dischargeable. Furthermore, the strength and clarity of the agreement "erects a substantial obstacle" to the debtor's ability to rebut this prima facie case. *Tilley*, 789 F.2d at 1078. Notwithstanding this conclusion the court has afforded the debtor an ample opportunity to rebut or explain the language in the agreement.

However, the Bankruptcy Court went on to say that:

In determining the parties' mutual intent, the court must look to all the relevant evidence on the intent of the parties. The court has listened to all the evidence the parties have offered on intent and has developed a full record in this case. In sum, the court sees nothing in the evidence which supports a finding that the "parties mutually intended an obligation of any nature other than that expressed in their written agreement."

This statement is a reference to the evidentiary hearing held on June 11, 1992, at the termination of which the Bankruptcy Court made extensive oral findings of fact and conclusions of law which reflect a more complete analysis of all the factors in *Kettner*. In fact, in his oral opinion the Bankruptcy Judge explicitly articulated the factors set forth in *Kettner* and then applied each of the factors in light of the Settlement Agreement and the evidence presented at trial. He found that: (1) the clear language of the agreement supports Mrs. Catron's position that the debt was non-dischargeable alimony; (2) that Mrs. Catron's financial situation warranted alimony or support, and that the periodic and lump sum amounts set forth in the Settlement Agreement would enable Mrs. Catron to maintain herself adequately, taking into account the lifestyle lived by the couple in the years just prior to their separation; (3) that the purpose of the agreement

was to provide Mrs. Catron with food, shelter, clothing, and transportation at the level to which she had been accustomed, and it was therefore consistent with a finding that the payments were alimony or support payments; and (4) that there was no evidence of overbearing.

Based on these facts, the Bankruptcy Court determined that, although certain portions of the Settlement Agreement, if examined in a vacuum, "smack of a traditional property settlement," the intent of the parties was to enter into an alimony or support agreement. Transcript of Proceedings, p. 309 (Bankr.E.D.Va. June 11, 1992). There is ample basis in the record to support the decision of the Bankruptcy Court that the debt created by Paragraph 2 of the Settlement Agreement was in the nature of alimony, maintenance or support and hence was non-dischargeable under 11 U.S.C. § 523(a)(5).

First, the clear language of the Settlement Agreement supports the finding. For example, Paragraph 2 itself categorizes the debt "as and for spousal support, alimony and maintenance." Further, Paragraph 4 of the Agreement explicitly states that it is the "mutual intent and bargain" of the parties that the obligations created by the Settlement Agreement are "in the nature of alimony, maintenance or support" and therefore "shall be considered, for the purposes of the federal bankruptcy laws, exempt from discharge and non-dischargeable in bankruptcy."

It is difficult to conceive of a more unambiguous statement of mutual intent. Mr. Catron signed this document, with its declaration of mutual intent, under seal, having first received the advice of counsel who actively and extensively participated in the negotiation of the language.

Although both he and the lawyer who advised him testified that Mr. Catron did not want to pay alimony because he thought he had a strong adultery claim, Mr. Catron's attorney also testified that Mr. Catron faced problems establishing his adultery claim and that Mrs. Catron's adultery countercharge was itself credible. This evidence refutes Mr. Catron's testimony that he had an iron-

clad defense to any claim for support based on his adultery charge. Moreover, the record is clear that, "after weighing the realities" with his lawyer, which included the merits of both adultery claims, Mr. Catron agreed to the terms of the Settlement Agreement, including the terms of Paragraph 2 and the statement of mutual intent in Paragraph 4. Significantly, when he was asked on the record: "Did you think that [the language of the Agreement] meant you had the intent to pay alimony?"—Mr. Catron answered: "Yes."

Furthermore, if Mr. Catron did not in fact share his wife's intent that the payments required by Paragraph 2 were for spousal support, he should have refused to sign the Settlement Agreement until such a provision was excised from it. Courts look with great disfavor upon the testimony of a person who disavows a declaration of intent made under seal and with the advice of counsel. This is especially true where, as here, the declaration was signed by Mr. Catron with the knowledge that the express purpose of the declaration was to preclude the ability to discharge the very debt which he presently challenges and where Mrs. Catron relied upon the declaration of mutual intent. In that regard, it is clear from the record that Mrs. Catron intended that the payments required by Paragraph 2 to be in the nature of spousal support and was willing to agree to the terms of the Settlement Agreement only because she understood that Mr. Catron intended, as he declared under seal, to make support payments as therein provided.

Second, the structure of the Settlement Agreement, including its non-support aspects, confirm the Bankruptcy Court's decision. The caption of the Settlement Agreement describes it as governing support and property issues. Its recitations reinforce the title, providing that "the parties desire to specifically provide, stipulate and agree concerning their estate and the conditions of the maintenance and support of the parties," and stating that those matters have been agreed upon after consideration of "Virginia's laws relative to property, custody, maintenance and support." Notwithstanding the absence of labels for its twenty numbered paragraphs, the Settlement Agreement is structured to address in separate provisions both the allocation of marital property and the establishment of the amounts, the terms of payment for, and the providing of security for the support payments.

Third, the amount and structure of the payments required by Paragraph 2 of the Agreement evidences that those payments are in the nature of support. Mrs. Catron had no independent source of support and, other than a nine month period at the beginning of the marriage, she had not worked outside the home during the marriage. Mrs. Catron did not possess a college degree. On these facts, it is reasonable for the Bankruptcy Court to concluded that Mrs. Catron required support.

Before the divorce, the Catron family lived exceedingly well. Their permanent residence was a riverfront home appraised at $1.5 million, complete with a swimming pool, a lighted tennis court, and a 125 foot pier. In addition to their residence, the Catrons also owned two boats, one of which was purchased for approximately $225,000, the other for approximately $13,000. They owned a condominium at a ski resort, and they drove expensive luxury cars, having purchased a Mercedes for $62,000 in 1988 and a Jaguar in 1989 at a cost of $47,000.

The couple traveled extensively, both within the United States and abroad. Mr. and Mrs. Catron also owned fine clothing, luxurious jewelry, and enjoyed other benefits of a highly comfortable lifestyle, including massages, manicures and pedicures at home, and the services of domestic help for the house and grounds.

According to Mrs. Catron, monthly living expenses during the last years of the marriage averaged $20,000, including a monthly expenditure of $2,500 for groceries, clothing, utilities and similar charges. Mr. Catron concurred that he and Mrs. Catron lived "high on the hog" and had an "extravagant lifestyle."

Mrs. Catron put her monthly minimum support requirements at $7,500 per month, approximately one third of the monthly expenses during the latter years of the mar-

riage. The Bankruptcy Court found, and the record shows, that the amounts of the lump sum payments, amortized over the 180 month period, and the periodic monthly payments were the equivalent of $7,500 per month.[4]

Fourth, other aspects of the Settlement Agreement point to the fact that the intent of Paragraph 2 of the Settlement Agreement was to provide for support. The record contains conflicting evidence as to Mr. Catron's net worth, with estimates ranging from $1.8 million to more than $4 million. Mr. Catron's assets, however, consisted largely of real estate or interests in real estate which, at the time of the divorce proceedings, were depressed in value with the consequent result that most of his holdings could not be liquidated at that time without substantial loss. Mr. Catron did not want to transfer any of those real estate interests to Mrs. Catron nor did he want her to have any say in what was to be done with them. According to Mr. Catron: "The only way I could settle this thing was to have alimony in there." This is confirmed by Mr. Catron's lawyer who testified that Mr. Catron knew that Mrs. Catron would not agree to remove from the agreement "the part about alimony." And, according to Mrs. Catron, her husband repeatedly told her in no uncertain terms "that I would not have equitable distribution."

The Settlement Agreement reflects these positions. For example, under its terms Mr. Catron retained all interest in all real estate except the marital home, which was to be sold. Thus, the structured drafting of the Settlement Agreement reflects that Mr. Catron bargained for what was most important to him, his real estate assets, so that he could "wheel and deal" with those assets so as to obtain the advantage they would provide in the event of an economic upturn, and that Mrs. Catron obtained what she most needed—maintenance and support. The fact that

a substantial amount of her support was deferred does not create the inference that it is not actually support. Indeed, Virginia law permits both periodic and lump sum alimony payments. Va.Code § 20–107.1 (1990 Repl. Vol.)

More to the point, is that where, as here, a wife does not receive substantial amounts of marital property, there is a greater need for continuing support. H. Sommer & M. McGarity, *Collier Family Law and The Bankruptcy Code* ¶ 6.04(5) (1992). The mere fact that the support is substantial does not convert it into a property settlement. That is especially true, where as here, a significant component of the support payments are deferred lump sum payments necessitated by Mr. Catron's restricted cash flow at the time the parties made their agreement.

Mr. Catron argues that certain aspects of the Settlement Agreement indicate that it is a exclusively a property settlement which does not contain a support component. He argues, for example, that the provisions precluding modification of the spousal support obligation and providing for its continuation even if Mrs. Catron remarries show that the obligation in Paragraph 2 is not for spousal support. This argument ignores the provisions of Virginia law which permit the parties to make support obligations which: (i) are not subject to modification; and (ii) continue upon remarriage or death. *See* Va.Code § 20–109 (1990 Repl.Vol.).[5] Nor does the tax treatment which the parties agreed to accord the support payments require the conclusion that the Settlement Agreement is merely a property settlement. The tax laws permit the parties to determine the tax consequences of alimony. Here, Mr. Catron had not paid taxes for some time because of his real estate transactions, and his divorce lawyer foresaw the continuation of that circumstance. Considering these facts, and the fact that Mrs. Catron had agreed to smaller peri-

---

**4.** The three lump sum payments of $300,000 are due in July 1995, July 2000 and July 2005. The total number of months spanned by this obligation is 180 months. The total of $900,000 is divided by 180 months, the result would be $5,000 per month. If this is added to the 180 monthly periodic payments of $2,500 per month, the total would be $7,500 per month for 180 months. Obviously, the deferred timing of the lump sum payments would mean that Mrs. Catron would not receive monthly payments in that amount.

**5.** Of course, here the parties agreed that Mrs. Catron's death would end the support obligation, but that remarriage would not.

odic payments of $2,500, it is not surprising that the negotiations relieved her of a tax burden that she likely would have had to satisfy and placed it on Mr. Catron who likely would not have had to pay taxes.

Finally, as to the fourth factor enumerated in *Kettner*, there was no evidence that even suggested that Mr. Catron's will was overborne. Considering all the components of that factor as articulated by *Kettner*, it is clear that, as Mr. Catron's own lawyer said, an argument to that effect would be "laughable."

Considering the record as a whole, the court has no difficulty in concluding that the findings of fact made by the Bankruptcy Court respecting the mutual intent of the parties are not clearly erroneous. Indeed, for the reasons set forth above, the court readily would reach on de novo review the same conclusions which prompted the Bankruptcy Court to conclude that Mrs. Catron proved by a preponderance of the evidence that the obligations created by Paragraph 2 of the Settlement Agreement are non-dischargeable.

Accordingly, the decision of the Bankruptcy Court is AFFIRMED.

It is so ORDERED.