**In re Darrel J. HUGHES.**

**Alice W. HUGHES, Plaintiff/Appellee,**

v.

**Darrel J. HUGHES, Defendant/Appellant.**

No. 2:92cv1272.
Bankruptcy No. 91–25793–T.

United States District Court,
E.D. Virginia,
Norfolk Division.

Feb. 4, 1994.

Jacqueline Ann Hoskins, Virginia Beach, VA, for defendant/appellant.

Jonathan Leigh Hauser, Deborah Stepp Kirkpatrick, Croshaw, Siegel, Beale, Hauser & Lewis, P.C., Virginia Beach, VA, for plaintiff/appellee.

Debera F. Conlon, Office of the U.S. Trustee, Norfolk, VA, for trustee.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

Darrel J. Hughes, a debtor in a Chapter 11 bankruptcy proceeding, appeals from a final order of the Bankruptcy Court that certain obligations provided for in a document entitled Agreement Pursuant to Sections 20–109 and 20–109.1, 1950 Code of Virginia, as amended (the "Settlement Agreement"), which were confirmed in a Final Decree of Divorce, were "in the nature of alimony, maintenance or support" and therefore not dischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(5). This appeal presents many of the same issues which were decided in a Memorandum Opinion and Order issued on January 21, 1994 in *Catron v. Catron,* 164 B.R. 912 (E.D.Va.1994). The Court heard oral argument on both appeals at the same hearing. For the reasons set forth in *Catron,* as amplified below, the decision of the Bankruptcy Court is affirmed.

## STATEMENT OF FACTS

Darrel J. Hughes ("Mr. Hughes") and Alice W. Hughes ("Mrs. Hughes") were married for 28 years. They had two children, both of which were non-dependent adults at the time of the divorce proceedings. One child, however, resided in the marital home with Mrs. Hughes at that time. The parties separated in 1987. The Settlement Agreement was executed on February 27, 1990, and the Final Decree of Divorce was entered on April 13, 1990.

In the years preceding the divorce, Mr. Hughes operated a successful site development business known as Virginia Builders, Inc. In 1990, Mr. Hughes owned 51% of the stock of Virginia Builders. In financial statements filed in 1988, 1989 and 1990, Mr. Hughes valued his interest in Virginia Builders at approximately $1.5 million. Mr. Hughes also owned a pawn shop and two other businesses which he thought had "great earning potential," although at the time, neither they nor the pawn shop generated income. In the years immediately preceding the divorce, Mr. Hughes' annual income ranged from $135,000 to $160,000. The Bankruptcy Court found, and the record supports, that Mr. Hughes had access to significant resources which allowed him and Mrs. Hughes to live "a fast track life-style." According to the record, Mr. and Mrs. Hughes owned a "lovely home" and "lovely cars." They entertained lavishly and owned extensive real property and a boat. One witness described their station as in the top three per cent of the community.

Mrs. Hughes was employed by Virginia Builders before and during the divorce proceedings. Her income was almost $700 per week or an estimated $35,000 annually.

According to an unaudited statement of assets and liabilities, as of July 31, 1990, Mr. Hughes' assets were slightly in excess of $4 million and his liabilities were slightly in excess of $1.3 million, with an "excess of assets over liabilities" of $2.739 million. His interest in Virginia Builders was valued at $1.53 million, and his interest in the other three businesses was valued at $483,000. Additionally, Mr. Hughes' owned a one-third interest in a real estate development partner-

ship which was estimated to have a fair market value of $610,000 in 1990. His 1988 and 1989 financial statements reflected a net worth of $6.5 million and $7.6 million, respectively.

At the evidentiary hearing conducted by the Bankruptcy Court, both parties testified that they believed the other to have committed adultery, and that it was this breakdown in the marital relationship which prompted their separation in 1987 and the subsequent institution of divorce proceedings.

Following the institution of the divorce proceedings, the parties undertook to settle their differences and entered the Settlement Agreement, the terms of which are the focal point of this appeal. In particular, the parties dispute whether the obligations provided in paragraphs 4, 6, 9 and 11 are "in the nature of alimony, maintenance or support" and consequently not dischargeable in bankruptcy.[1]

Paragraph 4 of the Settlement Agreement requires Mr. Hughes to transfer his interest in the marital residence to Mrs. Hughes, thereby making it her sole and exclusive property. At the same time, Mr. Hughes is obligated to continue to make the mortgage payments on the property. The payments required by this paragraph are not subject to judicial modification, are to be paid even if Mrs. Hughes remarries and are not taxable to Mrs. Hughes. The paragraph states that these obligations "... shall not be dischargeable in any bankruptcy proceeding, as same are for her [Mrs. Hughes'] support...."

Paragraph 6 of the Settlement Agreement obligates Mr. Hughes to continue to furnish hospitalization, medical and disability income insurance to Mrs. Hughes at the same levels that were provided for her by Virginia Builders in January 1990. Mr. Hughes' obligations under this paragraph, however, are suspended temporarily during any period in which Mrs. Hughes is employed by an employer other than Virginia Builders which offers her comparable insurance benefits at no cost to her. Like the payments in Paragraph 4, the payments for hospitalization, medical and disability income are to be made

without regard to whether Mrs. Hughes remarries, are not taxable to her and are not subject to judicial modification. The opening clause of Paragraph 6 provides that the payments therein required are "in the nature of additional support for Wife." The paragraph also provides that these payments "... shall not be dischargeable in any bankruptcy proceeding, as same are for her [Mrs. Hughes'] support...."

Under Paragraph 9 of the Settlement Agreement, the "... Husband shall pay to Wife in the nature of support for Wife the sum of Three Hundred Ten Thousand Dollars ($310,000) without interest ..." in the following manner: (i) $15,000 for each year from 1990 through 1994, payable in consecutive monthly installments of $1,250; (ii) $25,000 in 1995, payable in twelve monthly installments of $2,083; and (iii) $15,000 for the fourteen year period beginning in 1996 and concluding in 2009, payable in monthly installments of $1,250. This obligation is secured by Mr. Hughes' stock in Virginia Builders. According to this paragraph, the obligation is to be met without regard to whether Mrs. Hughes remarries and is neither taxable to her nor subject to judicial modification. Paragraph 9 concludes with the statement that these payments "... shall not be dischargeable in any bankruptcy proceeding, as same are for her [Mrs. Hughes'] support...."

Finally, Paragraph 11 obligates Mr. Hughes to maintain life insurance in the amount of $300,000 with Mrs. Hughes as the irrevocable sole beneficiary. Like the obligations provided in Paragraphs 4, 6 and 9, the obligation provided in paragraph 11 "... shall not be dischargeable in any bankruptcy proceeding, as same are for her [Mrs. Hughes'] support...." Although there is a dispute between the witnesses respecting the purpose of the payments required by Paragraph 9, it is undisputed that the purpose of the life insurance provided by Paragraph 11 is to fund the payments in Paragraph 9 if Mr. Hughes dies.

1. Paragraph 8 was at issue at the commencement of the proceedings before the Bankruptcy Court, but the dispute over it was removed at the hearing and so it is not at issue on appeal.

Notwithstanding the dispute over whether the provisions of Paragraphs 4, 6, 9 and 11 constitute payments in the nature of support, Mr. and Mrs. Hughes agree that other parts of the Settlement Agreement do provide for division of marital property. Paragraph 12, for example, provides that Mr. Hughes retains the one-third interest in the real estate development partnership, but requires him to pay Mrs. Hughes one-half of the 1990 present value thereof. Paragraph 14 provides for equal division of the parties' stock investments. Paragraphs 15 and 16 state that each spouse retains the personalty in his or her possession, including pensions and other employment benefits.

Both parties were represented by counsel in the negotiations which led to the Settlement Agreement. Further, the explicit requirements of Paragraphs 4, 6, 9 and 11 of the Settlement Agreement were reflected in full in the text of the Final Decree of Divorce.

Notwithstanding the clear language in the challenged paragraphs describing the payments and obligations therein required as in the nature of support for Mrs. Hughes, and notwithstanding the fact that Mr. Hughes acknowledges that he read the agreement carefully before he signed it and that he signed it voluntarily upon the advice of competent counsel, Mr. Hughes in these proceedings has disavowed his intent to pay support to Mrs. Hughes.

Mr. Hughes now says that the payments provided by Paragraph 4 are intended not for support, but to equalize the value between the marital residence and a lot at 1469 Trading Point Lane which he retains pursuant to the terms of the Settlement Agreement. The need for such equalizing payments, however, is called into question by the financial statements prepared by Mr. Hughes in 1988 and 1989, wherein the marital residence is valued higher than the Trading Point Lane property which he retains.

The obligations provided by Paragraph 9, according to Mr. Hughes, represent one-half the value of his 51% interest in Virginia Builders. Mr. Hughes says that Mrs. Hughes wanted one-half of the stock in that company, but that he refused to surrender it

to her and, hence, they compromised by providing for a cash payment of $310,000 spread over time. The predicate for this version of the purpose served by Paragraph 9 is that the value of Mr. Hughes' interest in Virginia Builders in 1990 was $620,000. This version of events also is suspect in view of the fact that in 1988, 1989 and 1990 Mr. Hughes estimated the value of his interest in Virginia Builders to be approximately $1.5 million, rather than the $620,000 which he contended before the Bankruptcy Court to have been the total value of his shares for purposes of calculating the payment to be made to Mrs. Hughes under Paragraph 9.

Mrs. Hughes and her lawyer both testified that the payments required by Paragraph 9 were negotiated to allow her to maintain a semblance of the lifestyle to which she had become accustomed during the marriage, taking into account that her income in 1990 was approximately $35,000. Mrs. Hughes testified that the residence was transferred to her so that she would have a home. According to her lawyer, Mr. Schwan, the provisions of Paragraph 9, like those of Paragraphs 4, 6 and 11, were structured to provide support for Mrs. Hughes.

Mr. Hughes' lawyer during the divorce proceedings, Mr. Canada, tended to support Mr. Hughes' version of the purpose underlying the $310,000 payment required by Paragraph 9. He also said that Mr. Hughes had an aversion to paying alimony. Mr. Canada did not clearly address the purpose of the payments required by Paragraphs 4 or 6. He agreed with the other witnesses that the insurance provision of Paragraph 11 was to fund the payments required by Paragraph 9. Mr. Canada, like Mr. Schwan, testified that support likely would have been awarded if the case had gone to trial.

The Bankruptcy Court heard all of this evidence and took it into account in reaching its decision. In the judgment of the Bankruptcy Court, "nothing in the evidence supports a finding that the 'parties mutually intended an obligation of any nature other than that expressed in their written agreement.'" That judgment is fully supported by the record.

## DISCUSSION

The findings of fact made by the Bankruptcy Court are subject to review for clear error. Fed.R.Bankr.Proc. 8013; *Gianakas v. Gianakas*, 917 F.2d 759, 762 (3rd Cir.1990). *Accord Tilley v. Jessee*, 789 F.2d 1074, 1075 (4th Cir.1986). Questions of law are subject to plenary review. *Gianakas*, 917 F.2d at 762; *In re Bialac*, 712 F.2d 426 (9th Cir.1983).

On appeal, Mr. Hughes advances two issues respecting the burden of proof on the issues of dischargeability, and two issues respecting the Bankruptcy Court's finding that the debt was not dischargeable.

### I. The Burden of Proof Issues

Mr. Hughes advances exactly the same issues respecting the burden of proof as did the appellant in *Catron*. Here, as in *Catron*, the Bankruptcy Court held that the written agreement of the parties was persuasive evidence of mutual intent which erected a substantial obstacle to be overcome by the debtor. Further, as in *Catron*, the Bankruptcy Court considered all of the evidence after a full hearing, and with respect to the mutual intent of the parties concluded that "nothing in the evidence supports the finding that the 'parties mutually intended an obligation of any nature other than that expressed in their written agreement.'" Unlike *Catron*, the Bankruptcy Court here did not issue verbal findings of fact or conclusions of law in addition to its written opinion. Nonetheless, it is clear from the Bankruptcy Court's opinion that it fully understood that Mrs. Hughes had the burden to prove that the debt was non-dischargeable. The opinion also clearly reflects that, after considering all the evidence, the Bankruptcy Court determined that Mrs. Hughes had met her burden.

### II. The Dischargeability of the Debt

Mr. Hughes asserts that the Bankruptcy Court erred in relying on the language of the Settlement Agreement in finding mutual intent and, in a related argument, he asserts that the Bankruptcy Court clearly erred in concluding that the obligations were "in the nature of alimony, maintenance or support." These challenges devolve into essentially the same issue: whether the Bankruptcy Court's factual finding was clearly erroneous.

As in *Catron*, the fundamental issue here is whether the parties mutually intended for the challenged provisions in the Settlement Agreement to be in the nature of alimony, maintenance or support. The record supports the finding of the Bankruptcy Court on this issue.

First, the clear language of the Settlement Agreement supports the finding made by the Bankruptcy Court. Each of the challenged obligations appear in paragraphs which describe them as not "... dischargeable in any bankruptcy proceeding, as same are for her [Mrs. Hughes'] support...." This language is clear and unequivocal in articulating that the purpose of the challenged obligations is to provide for the support of Mrs. Hughes.

Mr. Hughes testified that he read the Settlement Agreement and signed it after receiving the advice of counsel. Although Mr. Hughes and his lawyer both testified to the Bankruptcy Court that Mr. Hughes was averse to paying alimony and that he did not intend to do so, their current statements do not square with the words they knowingly used in the text of Paragraphs 4, 6, 9 and 11 of the Settlement Agreement.

Second, other provisions of the Settlement Agreement support the testimony of Mrs. Hughes and Mr. Schwan that the provisions of Paragraphs 4, 6, 9 and 11 were intended by both parties to be in the nature of support. For example, Paragraph 1 provides that Mr. Hughes releases Mrs. Hughes from any claims for spousal support and alimony, while Paragraph 2 provides that: *"except for the other provisions and/or undertakings as specified hereinafter* in this Agreement, the Wife waives spousal support claims form and/or against the Husband." (emphasis added). The language of these paragraphs illustrates that the parties intended some of the provisions of the Settlement Agreement to be for Mrs. Hughes' support. In addition, other provisions of the Settlement Agreement provide for division of the marital estate, and those paragraphs contain no language purporting to treat them as in the

nature of support. Taken as a whole, therefore, the Settlement Agreement reflects structured drafting for the purpose of providing for division of the marital estate in some of its parts and for the purpose of providing for spousal support in other parts.

Third, the relative financial circumstances of the parties clearly demonstrate a need for support in order that Mrs. Hughes could continue to enjoy some semblance of the lifestyle that attended the marriage. The undisputed record is that Mr. Hughes earned a salary in the last years of the marriage ranging from $135,000 to $160,000 per year, and that at the time of the settlement Mrs. Hughes' annual salary was approximately $35,000. Moreover, the monthly payments required by Paragraph 9 are consistent with an income level sufficient to enjoy a lifestyle substantially in excess of that which Mrs. Hughes could provide on her salary, and more nearly approximating the lifestyle during the marriage. The life insurance provisions of Paragraph 11 were included, according to the testimony of all parties, for the purpose of covering the obligations of Paragraph 9. The payments provided by Paragraph 4 constitute payments on the marital residence, which was given to Mrs. Hughes so that she would have a place to live. This is a classic payment in the nature of support and maintenance. The hospitalization, medical, and disability income insurance obligations imposed by Paragraph 6 are also fully consistent with payments in the nature of support.

Fourth, the independent evidence respecting intent confirms the characterization accorded the provisions of Paragraphs 4, 6, 9 and 11 by the Bankruptcy Court. Divorce counsel for Mrs. Hughes and for Mr. Hughes both testified that, in their opinion, the state court would have awarded support or maintenance in the divorce proceedings. This testimony makes it logical that the Settlement Agreement would provide for support payments, and therefore confirms the characterization of the payments required by Paragraphs 4, 6, 9 and 11 of the Settlement Agreement as in the nature of support. Mrs. Hughes and her counsel both testified that the parties negotiated the language regarding the purpose of these payments, and that the amount and the structure of the payments are for the purpose of supporting her. Mr. Hughes testified that he never intended to pay support, but he also testified that he read and understood the Settlement Agreement before signing it and, considering the unambiguous language of the Settlement Agreement, one could not execute the document without understanding that it requires payments in the nature of support which are not dischargeable in bankruptcy. Nothing in the testimony of Mr. Hughes' counsel undermines that conclusion. If Mr. Hughes did not intend to pay support he should have refused to execute, under seal, a document which clearly provided that he would do so. Additionally, Mr. Hughes retained the bulk of the marital property and, as the Court found in *Catron*, there is a greater need for continuing support where the wife does not receive substantial amounts of marital property.

Here, as in *Catron*, the appellant makes much of the fact that the four challenged payments continue without regard to whether Mrs. Hughes remarries and that Mrs. Hughes is not to be taxed on the payments. As explained in *Catron*, the parties are at liberty to make such agreements and the fact that they do so does not undermine the other compelling evidence that the payments required by Paragraphs 4, 6, 9 and 11 are in the nature of support.

The finding of the Bankruptcy Court to that effect is not clearly erroneous. Indeed, the Bankruptcy Court's finding is supported by substantial evidence in the record. Accordingly, the determination of the Bankruptcy Court is affirmed.

It is so ORDERED.