43 F.3d 1465
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
In Re: Curtis R. CATRON, Debtor.
v.
Curtis R. CATRON, Plaintiff-Appellant,
Nancy L. CATRON, Defendant-Appellee,
 No. 94-1279.
 United States Court of Appeals, Fourth Circuit.
 Argued: November 1, 1994.
Decided: December 21, 1994.
 
 UNITED STATES TRUSTEE, Party-in-interest. Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Robert E. Payne, District Judge. (CA-92-966-2)
 Frank James Santoro, Marcus, Santoro & Kozak, Portsmouth, Virginia, for Appellant.
 Walter Ware Morrison, W. Ware Morrison, P.C., Virginia Beach, Virginia, for Appellee.
 Joseph Todd Liberatore, Marcus, Santoro & Kozak, Portsmouth, Virginia, for Appellant.
 E.D.Va.
 AFFIRMED.
 Before HALL and MICHAEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Curtis Catron appeals an order of the district court, affirming the judgment of the bankruptcy court, holding that a debt owed by Catron to his ex-wife is nondischargeable. We affirm.
 
 I.
 
 2
 Curtis and Nancy Catron were married for twenty-six years. They raised two children and enjoyed a lavish lifestyle in an exclusive waterfront area of Virginia Beach, Virginia.[1] Mr. Catron was the sole breadwinner for almost the entire marriage. His day-to-day work was selling insurance, and he was very good at it,[2] but he also dabbled in real estate deals. The Catrons separated in May, 1989, and Mr. Catron soon filed suit for divorce on the ground of adultery. Mrs. Catron eventually filed a countersuit for divorce, which also charged adultery.
 
 
 3
 On July 30, 1990, after extensive settlement negotiations, the Catrons executed a "Final Permanent Support and Property Settlement Agreement." The agreement provided, in pertinent part:
 
 
 4
 Husband shall pay directly to Wife, as and for spousal support, alimony and maintenance, the (a) lump sum of $900,000 payable (i) $300,000 by the 1st day of July, 1995, and (ii) $300,000 payable by the 1st day of July, 2000, and (iii) $300,000 by the 1st day of July, 2005, and (b) periodic sum of $2,500 monthly for 180 months, ... but both being subject to automatic termination upon the death of Wife or payment in full of the lump sum spousal support and all periodic spousal support....
 
 
 5
 Unlike the typical alimony or support obligation, Mr. Catron's was not to be terminated by Mrs. Catron's remarriage.[3] While the payor of alimony may generally take an income tax deduction, the agreement specifically forbade Mr. Catron from taking the alimony deduction, and thus freed his wife from paying income tax on her receipts. Moreover, again unlike the archetype, this alimony obligation was not subject to modification by state courts based on changed circumstances. Finally, Mrs. Catron was entitled to equitable distribution of marital property under state law, but the agreement contains a waiver of this right.
 
 
 6
 In sum, there are circumstances from which one could infer that the $900,000 lump sum was, at least in some part, a property settlement. The language of the agreement, however, could not express more clearly or emphatically that the Catrons intended the money as alimony:
 
 
 7
 [I]t is their mutual intent and bargain, which goes to the very essence of this entire agreement, that the monetary payments, obligations, and liabilities assumed and set forth herein for the benefit of the parties, respectively, including spousal support whether lump sum or periodic, ... shall be considered, for the purposes of federal bankruptcy law,
 
 
 8
 exempt from discharge and non-dischargeable in bankruptcy as debt to a spouse or former spouse as being in the nature of alimony, maintenance or support as the debts, liabilities and obligations created by this agreement are intended for economic security....
 
 
 9
 By the fall of 1991, Mr. Catron was having trouble staying ahead of his creditors, and he filed a Chapter 11 bankruptcy petition on October 17 of that year. On December 3, he filed an adversary proceeding against his wife to determine the dischargeability of the $900,000 in lump sum "support."
 
 
 10
 After a trial in the bankruptcy court, the debt was held to be nondischargeable. In re Catron, 164 B.R. 908 (Bankr.E.D. Va.1992). The district court affirmed, In re Catron, 164 B.R. 912 (E.D. Va.1994), and Mr. Catron appeals.
 
 II.
 
 11
 The Bankruptcy Act of 1898 did not provide an explicit exception from discharge for support and maintenance of wife or child. In 1901, the Supreme Court recognized such an exception anyway, on the theory that a support obligation is a "natural duty" rather than a mere debt. Audubon v. Shufeldt, 181 U.S. 575, 577 (1901). Congress codified the exception in 1903. The provision's current form, 11 U.S.C. Sec. 523(a)(5), reads as follows, in pertinent part:
 
 
 12
 (a) A discharge under ... this title does not discharge an individual debtor from any debt--
 
 
 13
 * * *
 
 
 14
 (5) to a ... former spouse ... for alimony to, maintenance for, or support of such spouse ..., but not to the extent that--
 
 
 15
 * * *
 
 
 16
 (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.
 
 
 17
 This section is written in a roundabout way, but the bottom line is simple: a debt is not dischargeable merely because it is "designated" as alimony, maintenance, or support; it must "actually" be "in the nature" of one of them. One purpose of this provision is to prohibit collusive or coerced end runs around the bankruptcy code's fresh start policy, and another is to create a uniform federal rule independent of the vagaries of state law nomenclature.
 
 
 18
 Though the label affixed to a debt arising from divorce or separation is not dispositive of its "nature," a label affixed by the parties themselves in a settlement agreement is persuasive evidence of their intent, and the agreement erects a "substantial obstacle" for the party seeking to overcome it. Tilley v. Jessee, 789 F.2d 1074, 1077-1078 (4th Cir.1986). Intent is the focus of the inquiry. In re Robb, 23 F.3d 895, 897 (4th Cir.1994); Tilley, 789 F.2d at 1078 n. 4.
 
 
 19
 Dischargeability is a question of federal law, and because discharge is favored, the party opposing it has the burden of proof. Matter of Long, 794 F.2d 928, 930 (4th Cir.1986).
 
 III.
 
 20
 Mr. Catron argues that the bankruptcy court erred by shifting the burden of proof to him. He rests this argument on language in the court's memorandum opinion that tracks Tilley:
 
 
 21
 Adherence to Tilley in this case compels the court to conclude that the clear and unambiguous language of intent in the agreement establishes a prima facie case that the debt owed Mrs. Catron is non-dischargeable. Furthermore, the strength and clarity of the agreement "erects a substantial obstacle" to the debtor's ability to rebut this prima facie case. Tilley, 789 F.2d at 1078. Notwithstanding this conclusion the court has afforded the debtor an ample opportunity to rebut or explain the language in the agreement. 164 B.R. at 912. The court then announced that it had considered all evidence presented at trial, and it found that the Catrons mutually intended to create a support obligation.
 
 
 22
 As did the district court, we conclude that the bankruptcy court properly applied Tilley. Tilley says that the language of an agreement is persuasive evidence of the parties' intent and erects a "substantial obstacle" to the party opposing it. "Substantial obstacle" is a comment on the weight to be given the agreement, not a direction to shift the burden of proof, and that is precisely how the bankruptcy court applied it. In other words, even though Mrs. Catron had the burden to prove non-dischargeability, that burden would be satisfied if she introduced the agreement and Mr. Catron stood mute. The court's comment that Mr. Catron had to "rebut" the language of the agreement meant not that he had the ultimate legal burden of persuasion, but rather that he had a practical burden of going forward.
 
 IV.
 A.
 
 23
 On the merits, Mr. Catron's argument is not without some force. As we related above, this "alimony" obligation diverged from the typical in several ways: (i) Mrs. Catron's remarriage did not terminate the obligation; (ii) the agreement specifically forbade Mr. Catron from taking an alimony deduction on his income taxes; (iii) the award was not subject to modification by state courts based on changed circumstances; and (iv) Mrs. Catron waived her right to equitable distribution of marital property under state law.
 
 
 24
 In addition to these circumstances, Mr. Catron's divorce lawyer, who negotiated the agreement, testified that the payments were indeed intended as a property settlement,[4] and that they were designated as support for the very purpose of evading bankruptcy discharge. Surely one purpose of Sec. 523(a)(5) is to avoid such manipulations of the policy behind bankruptcy.
 
 
 25
 Mrs. Catron counters that, whatever Mr. Catron's unilateral intent, she needed and wanted support rather than property, and the nonstandard aspects of the "alimony" obligation are all perfectly legal.[5] She points out that, spread out over the fifteen years, her total support payments will amount to "only" $7,500 per month,[6] and she cites her entitlement to the life of luxury to which she was accustomed in defense of her argument that the obligation really is for support. She has a minimal work history and little prospect of earning a wage sufficient in and of itself to maintain her lifestyle.
 
 
 26
 We must accept the bankruptcy court's finding as to the parties' intent unless it is clearly erroneous. Under Tilley, the language of the agreement is "persuasive" evidence of intent, and it would be quite extraordinary for a factual finding resting upon persuasive evidence to nevertheless be clearly erroneous. This is not that extraordinary case. Given the plain language of the document and the materially conflicting testimony, we conclude that the district court's finding is not clearly erroneous.
 
 B.
 
 27
 Mr. Catron also argues that, intent notwithstanding, other factors may be considered to determine the "nature" of the debt. He urges us to engage in the much-criticized inquiry used by the Sixth Circuit in In re Calhoun, 715 F.2d 1103 (6th Cir.1983). In Calhoun, the court considered whether a loan assumption was dischargeable under Sec. 523(a)(5). After holding that the parties' intent was not dispositive, the court prescribed a broad probe into the obligee spouse's current need for support and would limit even such necessary support if it were "manifestly unreasonable" as a matter of (yet to be developed) federal law. Calhoun was uniformly rejected by the other circuits,[7] and the Sixth Circuit has since limited it to obligations not labeled by the state court as "alimony" or the like. In re Fitzgerald, 9 F.3d 517, 520-521 (6th Cir.1993). In short, after Fitzgerald, not even the Sixth Circuit would apply Calhoun here. We are not inclined to resuscitate it.
 
 
 28
 On the other hand, in the context of settlement agreements, we have never decided precisely what form any inquiry beyond intent ought to take, or even that such an inquiry is appropriate. See Tilley, 789 F.2d at 1078 n. 4. The bankruptcy code's fresh start policy and the interests of other creditors perhaps place some outer limit on how much money can be dedicated to the lavish support of the debtor's exspouse, even if that lavish support was intended by the parties. In addition to Calhoun 's, several lists of non-intent factors have been proposed. See Tilley, 789 F.2d at 1077 n. 2 (listing, but not adopting, three-factor test of In re Hawkins, 25 B.R. 430 (E.D.Tenn.1982)). In Gianakas, the Third Circuit listed fifteen factors, most with subparts, that a Pennsylvania state court had catalogued in a review of the case law. 917 F.2d at 762 n. 1 (quoting Buccino v. Buccino, 397 Pa.Super. 241, 580 A.2d 13, 22 (1990)).
 
 
 29
 In this case, the bankruptcy court used a test devised by District Judge Clarke in Kettner v. Kettner, No. 91-587-N (E.D. Va.1991).[8] In Kettner, Judge Clarke distilled four relevant factors from this circuit's cases, notably Tilley and Long: (i) the actual language of the agreement; (ii) the financial situation of the parties at the time of the agreement, including their prospects for future income; (iii) the function served by the obligation at the time of the agreement; and (iv) whether there is any evidence of overbearing at the time of the agreement that might make a court question the intent of a spouse.
 
 
 30
 The Kettner factors are not inconsistent with our cases, and we see no error of law in the bankruptcy court's use of them.[9] The only one of the four factors that might favor Mr. Catron is the third--at the time of the agreement, the obligation may have served in part as a surrogate for a property settlement. On balance, then, we affirm the judgment of the courts below that the obligation here is and was intended to be "in the nature" of alimony.
 
 AFFIRMED
 
 
 [1]
 In 1978, the Catrons built a mansion (appraised at $1.5 million) on three acres fronting the Lynnhaven River. The estate has a swimming pool, lighted tennis court, and 125-foot pier. Hired hands performed house and yard work. They owned two boats, expensive cars (e.g. a 1988 Mercedes and 1989 Jaguar), and a condominium at a ski resort
 
 
 [2]
 According to his own testimony, Catron was ranked among the top five hundred insurance agents in the world from 1985 to 1987
 
 
 [3]
 Mrs. Catron has remarried
 
 
 [4]
 The lawyer also explained that Mr. Catron blanched at the thought of a traditional property settlement, which would have forced him to either immediately sell some of his real-estate holdings or accept his wife's liens on them. Either course was unpalatable to Mr. Catron, but Mrs. Catron would not accept his promises to pay out her share of the property without some sort of security. Designating the payments as support so that they could not be discharged was the resolution
 
 
 [5]
 For example, Va.Code Sec. 20-107.1 (1990) provides, "The court, in its discretion, may decree that maintenance and support of a spouse be made in periodic payments, or in a lump sum award, or both." The combination here--relatively small monthly payments and large quinquennial lump sums--may have accommodated Mr. Catron's erratic income pattern better than large monthly payments alone. Therefore, the structure of the payments does not necessarily imply that they are not intended as support
 
 
 [6]
 She testified that $7,500 per month was "far less, really, than I was used to having. But I was bullied into it."
 
 
 [7]
 See, e.g., In reGianakas, 917 F.2d 759, 763 (3rd Cir.1990); Sylvester v. Sylvester, 865 F.2d 1164, 1166 (10th Cir.1989); Forsdick v. Turgeon, 812 F.2d 801, 803-804 (2nd Cir.1987); Draper v. Draper, 790 F.2d 52, 54 (8th Cir.1986); In re Harrell, 754 F.2d 902, 906-907 (11th Cir.1985)
 
 
 [8]
 The bankruptcy court's use of Kettner was in its ruling from the bench. The memorandum opinion that followed did not repeat the factorby-factor analysis
 There is some ambiguity, both in Kettner and the opinions below, about whether the four factors merely ascertain "intent" or are rather an inquiry beyond "intent" into the "nature" of the debt. This distinction--which may be more conceptual than real--need not concern us here, because the result is the same in any event.
 
 
 [9]
 We should note that our approval of the Kettner factors is not an enactment of them and should not be construed as disapproval of other formulae