**In re Jon S. AUSTIN, Debtor.**

**Stephanie Brunson, Plaintiff,**

**v.**

**Jon S. Austin, Defendant.**

**Bankruptcy No. 00–53104–S.
CMN No. 01–072.**

United States Bankruptcy Court,
E.D. Virginia,
Newport News Division.

June 4, 2001.

---

Richard W. Hudgins, Newport News, VA, for plaintiff.

Roy H. Lasris, Yorktown, VA, for defendant.

STEPHEN C. ST. JOHN, Bankruptcy Judge.

### Memorandum Opinion and Order

This matter came on for hearing upon an Objection to Priority Claim and an Objection to Confirmation of the Chapter 13 Plan. Stephanie Brunson ("Brunson") has objected to the Chapter 13 plan of the debtor, Jon Austin ("Austin"), on the basis that it fails to pay Brunson's claim in full. Austin has objected to Brunson's claim, arguing that the claim is not entitled to priority status because it is not in the nature of support and therefore should not be paid in full.[1] The following constitutes this Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

Austin and Brunson met in Idaho and were married on February 4, 1998 after a brief courtship. Austin and Brunson moved into Brunson's apartment at the time of their marriage. Like their courtship, the marriage was brief. The parties formally separated in December of 1998 when Brunson elected to terminate their union. Immediately prior to her separation from Austin, Brunson worked at an insurance agency and received $1475.00 in monthly income from her salary and receipt of child support payments. Austin

---

1. Brunson also filed a Complaint to Determine Dischargeability ("Complaint"), Adversary Proceeding No. 01–5012–S, alleging that in the event her claim should be found not to be a priority claim, it nevertheless should be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(15). As the case is proceeding under Chapter 13, this Court dismissed the Complaint at trial because a Chapter 13 discharges debts that in a Chapter 7 case would be declared nondischargeable under § 523(a)(15). *See* 11 U.S.C. § 1328(a)(2) (2001) (noting that a Chapter 13 discharges all debts except "any debt ... of the kind specified in paragraph (5), (8) or (9) of section 523(a)"). In addition, Brunson filed a Motion for Relief from Automatic Stay seeking relief to permit Brunson to pursue the alleged support claim under state law. This Court similarly dismissed the motion for relief.

worked as a production planner for Newport News Shipbuilding and Drydock Company, and his gross monthly pay was $3280.00.

On December 30, 1998, Austin and Brunson entered into a Property Settlement and Separation Agreement ("Agreement"). Brunson and Austin created the Agreement by using a template of a property settlement agreement created by Austin's attorney during the course of an earlier divorce of Austin. Neither was represented by counsel in the completion and execution of the Agreement, and each hoped using Austin's earlier property settlement agreement would permit them to avoid legal expense.

The Agreement provided for Brunson to remain in the Idaho apartment that she and Austin rented during their marriage. The Agreement also called for Brunson to retain the furniture and any items purchased during the marriage. She also retained her automobile, which she owned prior to her marriage to Austin. Austin agreed to be liable for all credit card, medical, dental and hospital bills in his name and promised to pay the required monthly payments, on time, of a credit union consolidation loan in the then current balance of $3800.00, as well as a savings and loan indebtedness also for a consolidation loan in the amount of $9900.00 (collectively "Consolidation Loans"). Austin also agreed to pay four credit card bills in the cumulative amount of $17,900.00 (collectively "Credit Card Bills").[2] The Credit Card Bills represent charges both spouses incurred during the marriage. Austin was to pay the Consolidation Loans and the Credit Card Bills in full within forty-eight hours of any monies awarded to Austin from his then pending lawsuit. The lawsuit, then pending in the Circuit Court of the City of Newport News, Virginia, involved personal injuries Austin sustained as a result of an accident prior to his marriage to Brunson ("Virginia Lawsuit"). The Agreement further provided that "[Austin] promises to pay [Brunson] twenty-five percent (25%) of the gross settlement award, by certified cashier check, within 48 hours of receipt of any and all monies awarded in the pending case." The Agreement also contained a clause that purported to deal with the discharge of any obligations of either Brunson or Austin in the event of a bankruptcy filing by either spouse.[3]

Brunson typed the first draft of the Agreement, which contained a provision requiring Austin to pay Brunson $ 200,-000.00 out of Austin's anticipated Virginia Lawsuit settlement. Austin declined to execute the Agreement with this obligation at such a high amount. He later executed the Agreement with its provision requiring payment of 25% of the proceeds from the Virginia Lawsuit to Austin and the payment of the Credit Card Bills and Consolidation Loans. Brunson described the purpose of this provision of the Agreement as a reflection of Austin's gratitude to Brun-

2. These bills were as follows:

| Creditor | | Balance |
| --- | --- | --- |
| Citibank: | Visa | $6800.00 |
| First USA: | Visa | 2300.00 |
| Peoples Bank: | Visa | 4200.00 |
| Providian: | Visa | 4600.00 |

3. Paragraph VI. L. of the Agreement provides as follows:

It is understood and agreed that all of the obligations in this Agreement arise out of the support duties of the parties during the marriage and thus shall not be discharged in bankruptcy. It is expressly agreed that should either file for bankruptcy and be relieved of any obligation imposed by this Agreement, then the other party shall be permitted to petition a court of competent jurisdiction and receive an award of spousal support sufficient to cover any liability, loss or expense that he or she may incur due to the other's bankruptcy.
(Pl.'s ex. 2.)

son for her assistance in obtaining the Consolidation Loans, which consisted largely of his debts incurred prior to their marriage, as well as his desire to provide Brunson with a house and reliable transportation.[4] Austin painted a slightly different picture of the purpose of the payment of a portion of the Virginia Lawsuit proceeds to Brunson, stating it was Brunson's desire to use the proceeds to purchase "a red, four-wheel drive Dodge diesel truck, which was like her dream vehicle to have." (Tr. at 69.)

The couple subsequently received a decree of divorce on October 20, 1999. The divorce decree incorporated the material provisions of the Agreement, including the requirement that Austin pay 25% of the gross proceeds from the Virginia Lawsuit to Brunson and pay off any remaining balance on the Consolidation Loans and the Credit Card Bills with the Virginia

Lawsuit proceeds. Ultimately Austin reached a settlement of his pending Virginia Lawsuit in the amount of $150,000.00, from which he received the net amount of $84,770.70 after payment of his attorney's fees and costs. The parties stipulated that out of these net proceeds, Austin paid $18,786.59 to his medical insurance plan to satisfy a lien imposed from payments made on behalf of Austin by the Newport News Shipyard medical insurance plan. The parties further stipulated that Austin paid his former wife Tracy $6598.00, pursuant to their divorce decree. In addition, Austin testified that he paid his parents $9000.00 and paid $17,500.00 toward the debts that the Agreement obligated him to pay.[5] Austin did not pay any amount to Brunson in satisfaction of the provision of the Agreement requiring Austin to pay 25% of the gross proceeds of the Virginia Lawsuit to Brunson.[6]

---

4. Brunson testified as follows concerning the purpose of the payment of monies for Austin's anticipated personal injury litigation settlement:

He had talked a lot during our marriage. When I was consolidating the debt that he had prior to our marriage to get lower interests rates, he would always comment that when he received the settlement from the injury case in Virginia that he was going to pay all of the debts and help to get into a house and reliable transportation. I'm still driving the same car with 203,000 miles on it. And that was a concern, so the intent probably was for—to help get into better living conditions, better reliable transportation. (Tr. at 13, 14.)

During examination by counsel for Austin, Brunson later testified regarding the purpose of the proposed $200,000.00 payment:

Q. How did you arrive at $200,000?

A. Like I said, through the course of the marriage and he was constantly—he was very grateful to the fact that I helped him take care of his debts and consolidate it. Every time I would do that, he would tell me that when he got the settlement agreement, that he was going to take care of all of the debt, that he was going to provide a house and reliable transportation.

Q. So $200,000 was to buy you a house and reliable transportation, but that's on top of paying the debt, correct?

A. Right.

(Tr. at 46.)

5. Neither the testimony nor the documentary evidence reveal to which specific debts Austin applied the $17,500.00. The evidence merely demonstrates that Austin applied $17,500.00 of the settlement proceeds to some portion of the Credit Card Bills or Consolidation Loans.

6. Even assuming Austin's testimony to be true, the complete disposition of the settlement proceeds remains unexplained. In the parties' stipulation, paragraph seven states that after payment of the attorney's fees and costs, the payment to the medical insurance plan, and the payment to Tracy Austin, "$59,386 remained." At trial, the parties expressed disagreement over this part of the so-called stipulation. Counsel for the debtor, Mr. Lasris, argued "We so stipulate to those facts as long as there's not impunity at the end of the stipulation. In other words, he pays that amount of money, but he paid a lot more money than that. I don't want us to be stuck with a stipulation that that's all that he

Subsequently, Brunson commenced state court litigation in Idaho to enforce the Agreement's provisions concerning Austin's obligation to pay a portion of the Virginia Lawsuit proceeds to Brunson and use another portion to pay the Consolidation Loans and Credit Card Bills. In defense, Austin alleged that the Agreement was unenforceable due to fraud, misrepresentation and lack of consideration. The Idaho state court disagreed, finding the Agreement to be enforceable. The Idaho state court concluded that the terms of the Agreement were clear and unambiguous, and that Austin's allegations of a lack of consideration were unsupported. In a subsequent order, the Idaho state court awarded Brunson costs in the amount of $1920.00. Finally, the Idaho state court conducted a hearing on November 6, 2000 and received evidence from Brunson as to the extent of the damages occasioned by Austin's default under the Agreement. The court awarded a judgment against Austin in the amount of $11,934.00 plus interest of $1575.84, representing Austin's failure to pay the Consolidation Loans and the Credit Card Bills in full. The court awarded a second judgment against Austin in the amount of $37,500.00 plus interest of $4808.70, representing Austin's failure to pay Brunson 25% of the Virginia Lawsuit proceeds. The state court requested Brunson to submit a memorandum of fees and costs to support her claim for an award of attorney fees and costs under the Agreement. There is no evidence in this record as to the disposition of the request for an award of attorney fees and costs, nor did Brunson introduce any evidence at trial as to any amount of attorney fees incurred by Brunson to enforce the Agreement or otherwise.

Seeking a fresh start, Austin commenced this bankruptcy case under Chapter 13 of the United States Bankruptcy Code on December 27, 2000. Austin's first plan listed no priority creditors under 11 U.S.C. § 1322(a)(2). On January 24, 2001, Brunson filed her Objection to Confirmation of Plan ("Objection"), alleging (i) she holds a priority claim for spousal support, which Austin's plan did not provide for the payment in full; (ii) Austin was not applying all of his disposable income to payments under the Plan; and (iii) Austin did not file the plan in good faith because Austin willfully ignored a court order to pay 25% of the proceeds of a settlement. On February 2, 2001, Brunson filed a proof of claim in the amount of $61,773.10 ("Brunson Claim"), alleging that this amount was payable as a support obligation of Austin. Austin filed an objection to the Brunson Claim, stating that "[t]he claim of Stephanie Brunson is not alimony, not adjudged as alimony, has no 'attributes' of alimony and is not in the nature of alimony, maintenance, or support owed to a spouse, former spouse, or child pursuant to 11 U.S.C. § 507(a)(7)." Subsequently, Austin has modified his Chapter 13 Plan twice, but continues to maintain that he has no obligation to pay the Brunson Claim in full as a priority claim under his plan.

As will become apparent in the discussion to follow, a brief review of the parties' present financial circumstances is necessary. Austin has returned to Virginia, remarried and presently resides in Newport

---

paid." (Tr. at 65). Deducting the $17,500.00 paid pursuant to the Agreement and the $9000 paid to Austin's parents, $ 32,866.11 still remains unexplained. Nonetheless, on direct examination, Austin responded that he was unable to account for the $13,000 that he

believed remained unexplained. Although the Court finds more than $13,000 to be unaccounted for, it is sufficient for our purposes that it is undisputed that Austin paid only $17,500 toward his obligations under the Agreement.

News, Virginia. As of the filing date, Austin's bankruptcy schedules indicate a monthly income of $3874.00. Austin's non-filing spouse, who also works for Newport News Building and Drydock Company, earns a monthly income of $2966.30. Austin's amended schedule J of his bankruptcy schedules indicates monthly household expenses of $3939.68.

Brunson is thirty-two years old, has four children by her earlier marriages and presently works as an office manager at a retail sporting goods store in Idaho. Brunson currently has a gross monthly income of $2817.00, including her income of $1200.00, child support in the amount of $1295.00, and a payment of $322.00 from the Social Security Administration for one of Brunson's children who has a disability. She has monthly expenses of $2808.18.

## CONCLUSIONS OF LAW

Brunson's Objection to Confirmation of Austin's Chapter 13 plan and Austin's Objection to Brunson's claim both involve the same issue: whether Brunson's claim is entitled to priority status as being a claim in the nature of alimony, maintenance or support. If the claim is in the nature of support, then it is entitled to priority status. *See* 11 U.S.C. § 507(a)(7) (2001) (including within the definition of a priority claim all "allowed claims for debts to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce

decree or other order of a court of record...."). Whether the claim is entitled to priority status is important because in a Chapter 13 plan the debtor must provide for the payment in full of all claims entitled to priority in order to have the plan confirmed. 11 U.S.C. § 1322(a)(2) ("The plan shall ... provide for the full payment ... of all claims entitled to priority under section 507 of this title....").[7] In the instant case, Austin has not accorded priority treatment for Brunson's claim. Consequently, a finding that the claim is in the nature of support and entitled to priority status would require this Court to deny confirmation of Austin's plan for failure to pay Brunson's claim in full.

Although the priority status accorded to a claim determined to be in the nature of support is based upon § 507, courts have used the case law interpreting § 523(a)(5) to determine whether the subject debt is actually in the nature of alimony, maintenance or support because the language of § 507(a)(7) mirrors that of § 523(a)(5).[8] *See In re Taylor,* 252 B.R. 346, 351 (Bankr.E.D.Va.1999); *In re Crosby,* 229 B.R. 679, 681 (Bankr.E.D.Va.1998) ("Because the language of the two sections is identical, if the debt is non-dischargeable under section 523(a)(5) it receives priority status under section 507(a)(7)."); *In re Grady,* 180 B.R. 461, 464 (Bankr. E.D.Va.1995) ("Notwithstanding the fact that the issue was brought under § 507(a)(7)(B), the plethora of case law discussing whether debts are 'actually in

---

7. Although the Code provides a "superdischarge" to the Chapter 13 debtor, Chapter 13 will not discharge a debt that would be non-dischargeable under § 523(a)(5). 11 U.S.C. § 1328(a)(2) ("[T]he court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt ... of the kind specified in paragraph (5), (8) or (9) of section 523(a)....").

8. Section 523(a)(5) prohibits the discharge of a debt "to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record...." *Id.* § 523(a)(5).

the nature of alimony, maintenance or support' under § 523(a)(5) is applicable and useful precedent in determining whether such debts should receive priority treatment."); *see also In re Pearce*, 245 B.R. 578, 582–83 (Bankr.S.D.Ill.2000) ("[G]iven the similarity of language and purpose of § 507(a)(7) and § 523(a)(5), the definition of 'support' developed under § 523(a)(5) should have equal effect under § 507(a)(7).... As a result, case law interpreting § 523(a)(5) constitutes guiding precedent in construing § 507(a)(7)....."). Consequently, both Brunson's Objection to Confirmation of Austin's plan and Austin's Objection to Brunson's claim will be resolved based on this Court's determination of whether the subject debts are "in the nature of alimony, maintenance or support." The Court will now focus its attention on this ultimate issue.

## I. IN THE NATURE OF SUPPORT

■ The greatest benefit bankruptcy affords a debtor is the opportunity for a fresh start, free from his onerous economic burdens. For this reason, Congress has sought to delineate only a limited number of exceptions to the dischargeability of debts in bankruptcy, of which bankruptcy courts must construe narrowly. The policy underlying § 523(a)(5), however, "departs from the general policy of absolution or fresh start in order to 'enforce an overriding public policy favoring the enforcement of familial obligation.'" *Robb–Fulton v. Robb (In re Robb)*, 23 F.3d 895, 897 (4th Cir.1994) (quoting *Sampson v. Sampson (In re Sampson)*, 997 F.2d 717, 721 (10th Cir.1993)); *see also Garza v. Garza (In re Garza)*, 217 B.R. 197, 200 (Bankr.N.D.Tex. 1998) ("Exceptions to dischargeability are generally subject to a narrow construction. However, various courts have ruled that exceptions from discharge for child and spousal support deserve a liberal construction since the policy underlying § 523(a)(5)

favors enforcement of support obligation over a debtor's fresh start."); *Zaera v. Raff (In re Raff)*, 93 B.R. 41, 44 (Bankr. S.D.N.Y.1988) ("Although a debtor files for bankruptcy to acquire a 'fresh start', the interest in a fresh start is a matter of federal bankruptcy policy that Congress considered, but resolved in favor of debtors' spouses when it enacted § 523(a)(5).").

■ The objecting spouse bears the burden of proving that the claim at issue is "actually in the nature of alimony, maintenance or support." *Tilley v. Jessee*, 789 F.2d 1074, 1077 (4th Cir.1986), *cited in In re Taylor*, 252 B.R. 346, 352 (Bankr. E.D.Va.1999). For the purpose of determining a debt's dischargeability, whether the debt is for support or just a mere property settlement is a matter of federal bankruptcy law. *See Long v. West (In re Long)*, 794 F.2d 928, 930 (4th Cir.1986); *Taylor*, 252 B.R. at 352 ("[T]he bankruptcy court must make an independent determination of what constitutes alimony, maintenance or support under federal standards."); *Burns v. Burns (In re Burns)*, 186 B.R. 637, 641 (Bankr.D.S.C.1992); *Grasmann v. Grasmann (In re Grasmann)*, 156 B.R. 903, 907 (Bankr.E.D.N.Y. 1992); *Boyd–Leopard v. Douglass (In re Boyd–Leopard)*, 40 B.R. 651, 654 (Bankr. D.S.C.1984). Although federal law controls, state law should not be ignored completely. *See Bedingfield v. Bedingfield (In re Bedingfield)*, 42 B.R. 641, 645 (S.D.Ga. 1983); *Taylor*, 252 B.R. at 352. The parties' intent controls whether the obligation is in the nature of support or is a property settlement. *In re Crosby*, 229 B.R. 679, 681 (Bankr.E.D.Va.1998) (noting that "[w]hether payments are 'in the nature of alimony, maintenance, or support' is determined by the intention of the parties that the payments be for support rather than a property settlement" (citing *Long*, 794 F.2d at 931)); *see also Garza*, 217 B.R. at

200 ("[T]he court is to construe the intent of the parties ... in creating the obligation and the purpose of the obligation *in light of the parties' circumstances at the time of the divorce.*"); *Grasmann,* 156 B.R. at 908 ("What guides the bankruptcy courts in deciding whether marital obligations [are in the nature of support or a property settlement] is the intent of the state court in fixing the obligation and the purpose of the obligation in light of the parties' circumstances at the time.").

■ Determining the parties' intent is not an easy task. To make this determination, the Court will consider four general factors: (i) whether, at the time of the agreement, any evidence of overreaching exists, (ii) the language and substance of the agreement, (iii) the parties' financial circumstances at the time of the agreement, and (iv) the role of the obligation at the time of the agreement. *Crosby,* 229 B.R. at 681 (citing *Catron v. Catron (In re Catron),* 164 B.R. 912, 919 (E.D.Va.1994), *aff'd,* 43 F.3d 1465, 1994 WL 707966 (4th Cir.1994)).

### A. Overreaching

At the outset, the Court dismisses the first factor of overreaching as inapplicable to the facts of this case. In *Kettner v. Kettner,* No. 91–587–N (E.D.Va. Nov.19, 1991), Judge Clarke stated:

In determining whether a spouse's will has been overborne, the court should consider whether both parties were represented by an attorney, whether the terms of the agreement grossly favor one spouse over the other or leave one spouse with virtually no income, the statements of the spouses in court, the age, health, intelligence and experience of the spouses, the bargaining positions of the parties, whether there were any misrepresentations, and whether the creditor spouse had knowledge of the

debtor spouses' weakness or inability to fulfill the terms of the agreement.

*Id.* at 4, *quoted in Catron,* 164 B.R. at 919. In the instant case, neither party was represented by an attorney at the time the parties entered into the Agreement. Austin's testimony that he would sign anything to have a chance to save his marriage, and Brunson's departure soon after the Agreement was signed provide the only evidence of any overbearing or misrepresentation. Austin's theory appears to be that he was blinded by love and the hope of reuniting with Brunson, and therefore he agreed to the terms of the Agreement only because he believed Brunson would honor her promise and stay if he signed the Agreement. It is safe to say that the misrepresentation and overbearing apparently alleged in the instant case does not rise to level of deceit necessary to impact the Court's analysis. Furthermore, the Idaho state court considered Austin's contention that the Agreement was unenforceable due in part to Brunson's alleged misrepresentations, and rejected such a defense.

### B. Language and Substance of Agreement

■ Moving to the second factor, the Court must address the actual language and substance of the agreement. *See Catron,* 164 B.R. at 919. In this context, the Court should be cognizant of the context in which the obligation arises under the agreement. *See Catron,* 164 B.R. at 919; *Grasmann,* 156 B.R. at 908. For example, a contingency such as whether the obligation terminates upon the death or remarriage of the creditor-spouse is relevant. *See Catron,* 164 B.R. at 919; *Grasmann,* 156 B.R. at 908. Moreover, "[t]he label assigned to a particular payment is a significant factor," *Grasmann,* 156 B.R. at 908, but the court is not bound by the particular label, as it must "look behind

the label and determine the true nature of the obligation," *Garza,* 217 B.R. at 201; *see also Catron,* 164 B.R. at 919 ("The label assigned to a particular payment is a significant factor, but not controlling...." (quoting *Kettner,* No. 91–587–N, slip op. at 2–3)); *Boyd–Leopard v. Douglass (In re Boyd–Leopard),* 40 B.R. 651, 654 (Bankr. D.S.C.1984) ("The characterization placed on the award by a state court in the decree is not determinative. The function or purpose which the award was intended to serve or support is the crucial issue."). The method of payment is also probative of whether the debt is in the nature of support. Whether the payment is to be made in a lump sum or over a period of time and whether the payment is to be made directly to the spouse or to a third party are relevant considerations. *See Catron,* 164 B.R. at 918; *Baker v. Baker (In re Baker),* 146 B.R. 862, 866 (Bankr. M.D.Fla.1992); *Peterson v. Peterson (In re Peterson),* 133 B.R. 508, 512 (Bankr. W.D.Mo.1991). Finally, the tax treatment accorded to the debt may also be significant. *Peterson,* 133 B.R. at 512–13.

In the case *sub judice,* the structure of the Agreement is not complicated. The Agreement divides the marital residence, personal property, and motor vehicles among Austin and Brunson. Immediately following this division of property, in the section labeled "Debts," the Agreement makes Austin liable for all debts, including the Credit Card Bills and Consolidation Loans. Within this same section, the Agreement addresses the Virginia Lawsuit. In one paragraph, the Agreement notes that all balances of the Credit Card Bills are to be paid off in full "within 48 hours of receipt of any and all monies awarded in the [Virginia Lawsuit]." The next paragraph recites Austin's duty to pay 25% of any settlement proceeds from the Virginia Lawsuit to Brunson. Construing these paragraphs as a whole, it

appears that the section entitled "Debts" assigns all credit card debt, including the Credit Card Bills, and the Consolidation Loans to Austin and provides a method of payment from the Virginia Lawsuit. The section also establishes a debt owed to Brunson in an amount equal to 25% of any proceeds received from the Virginia Lawsuit.

As to the method of payment, Austin was to pay the Credit Card Bills and Consolidation Loans monthly until receipt of the Virginia Lawsuit proceeds. At such time, Austin should have paid both debts in full. Simultaneously, Austin should have paid 25% of the proceeds to Brunson in the form of a lump sum payment.

Perhaps as relevant as the plain language and structure of the Agreement, is what the Agreement does not address. The Agreement makes no statement of contingencies—for example, Austin's obligations do not cease should Brunson die or remarry. Similarly, the Agreement does not label any section of the Agreement as alimony, maintenance or support. In fact, the only mention of support is found near the end of the Agreement, in which the Agreement states that all obligations in the Agreement "arise out of the *support* duties of the parties...." (Pl.'s ex. 2.) (emphasis added). On its face, the Agreement appears to simply divide the parties' property and debt.

### C. Parties' Financial Situation at Time of Agreement

 The second general factor to consider is the parties' financial situation at the time of the agreement. Several variables may inform the Court's analysis, such as the prior work experience and abilities of the parties, their physical health, potential earning power and business opportunities, and correspondingly their probable

need in the future. *See Bedingfield v. Bedingfield (In re Bedingfield)*, 42 B.R. 641, 647 (S.D.Ga.1983); *Grasmann v. Grasmann (In re Grasmann)*, 156 B.R. 903, 908 (Bankr.E.D.N.Y.1992); *Zaera v. Raff (In re Raff)*, 93 B.R. 41, 47 (Bankr. S.D.N.Y.1988). If applicable, the stability of the parties' income at the time of the agreement and whether one spouse has custody of minor children from the marriage are relevant factors to consider. *Catron*, 164 B.R. at 919.

In the instant case, both Austin and Brunson are high school graduates with minimal post-secondary education. Although Brunson does support four minor children, none of these children are from her marriage to Austin. As to physical health, Austin did sustain physical injuries prior to marrying Brunson, but no proof was adduced as to the extent of those injuries and whether they limit his ability to maintain gainful employment. Nonetheless, both Austin and Brunson are employed. Austin has maintained steady employment for sixteen years at the Newport News Shipbuilding and Drydock Company, while at the time of the Agreement Brunson was employed part-time for Allstate Insurance. At the time of the Agreement, Austin did make nearly $2000 more a month than Brunson.

### D. Intended Role of Obligation at Time of Agreement

■ The third general factor to consider is the role the obligation was intended to perform at the time the parties entered into the Agreement. The statements of the parties in the instant case may be considered in determining the function the obligation was intended to perform. *Catron*, 164 B.R. at 919. Both parties testified in some form that they intended the settlement proceeds to provide Brunson with reliable transportation. Brunson also testified that it was intended to go toward a new home.

■ Besides their testimony, the court may consider the length of the marriage, who was at fault in the marriage, and if any children were born from the marriage. *See id.; Peterson v. Peterson (In re Peterson)*, 133 B.R. 508, 512 (Bankr.W.D.Mo. 1991); *Raff*, 93 B.R. at 47. The marriage produced no children and lasted less than two years. Irreconcilable differences formed the basis for the decree of divorce.

Whether the debt is for a past or future obligation, allocates debt, or divides property are also relevant variables. *Peterson*, 133 B.R. at 512–13. In the instant case, the credit card debt clearly allocates the debt to Austin, while the Agreement gives the personal property to Brunson. Moreover, the credit card debt is for a past obligation. As to the settlement proceeds, the Agreement contemplates a division of property in percentages and, at the time of the Agreement, was a future obligation.

■ Finally, to determine if there was a genuine need for support at the time of divorce, the court may also consider the standard of living enjoyed during the marriage, whether the agreement "serve[d] to provide such daily necessities as food, clothing, shelter, and transportation," *Kettner v. Kettner*, No. 91–587–N, slip op. at 3–4 (E.D.Va. Nov.19, 1991), *quoted in Catron*, 164 B.R. at 919, whether the award was intended to balance a disparity in incomes, and whether, without the debt at issue, the support award would have been sufficient, *see Grasmann*, 156 B.R. at 908; *Baker v. Baker (In re Baker)*, 146 B.R. 862, 866 (Bankr.M.D.Fla.1992); *Peterson*, 133 B.R. at 512; *Raff*, 93 B.R. at 47.

In the instant case, the disparity in income approached $2000 at the time of separation. Moreover, the settlement proceeds do appear to have been intended for

housing and transportation. Nevertheless, the parties did not enjoy a high standard of living during their marriage. For example, the couple lived in the 800 square foot apartment, which Brunson still resides in today with four children from a previous marriage.

The application of these various factors may differ in light of the particular debt being analyzed. Similarly, some factors may weigh more heavily in the context of a particular form of debt. For these reasons, the Court will turn its attention to the specific debts at issue and examine in greater detail the more relevant factors to each debt.

## II. CREDIT CARD BILLS AND CONSOLIDATION LOANS

The division of debt may be in the nature of support in appropriate circumstances. In *Ferebee v. Ferebee (In re Ferebee)*, 129 B.R. 71 (Bankr.E.D.Va.1991), an agreement to pay the credit card debt, a furniture loan, and a car lease was found to be a nondischargeable obligation of the debtor as such debts were held to be in the nature of support. *See id.* at 73–74. In his opinion in *King v. Speaks (In re Speaks)*, 193 B.R. 436 (Bankr.E.D.Va. 1995), Judge Mitchell cited *Ferebee* for the principle that "[i]t is well-settled that an agreement to hold a spouse harmless on specific debts may qualify as nondischargeable under [§ 523(a)(5) ]." *Id.* at 442.[9] Judge Mitchell noted that "[t]he inquiry is particularly fact intensive...." *Id.*

In addressing credit card obligations, many courts have found such debts nondischargeable as in the nature of support largely on the basis of the parties' disparity in income. *See, e.g., Midnet v. Midnet (In re Midnet)*, 84 B.R. 776, 779 (Bankr. M.D.Fla.1988) (discharging the credit card debt because the obligation did not terminate upon death or remarriage and there was no evidence of disparate incomes); *Young v. Young (In re Young)*, 72 B.R. 450, 453 (Bankr.D.R.I.1987) (holding the assumption of a credit card debt to be nondischargeable based on a waiver of alimony and a "significant" disparity of income). Similarly, courts have focused a great deal of attention on the effect on the spouse's finances should the court conclude that the debt is not in the nature of support.[10]

**9.** The fact that the debt is owed to a third party, such as a credit card company, does not bar the application of § 507(a)(7). *See, e.g., In re Pearce*, 245 B.R. 578, 583 (Bankr. S.D.Ill.2000) ("[A] debtor's obligation to pay marital debts may qualify as priority under § 507(a)(7) even though the debts are payable to a third party and not directly to the debtor's ex-spouse or child."). This Court agrees with the court in *Dewey v. Dewey (In re Dewey)*, 223 B.R. 559 (10th Cir. BAP 1998), *aff'd*, 202 F.3d 281, 1999 WL 1136744 (10th Cir. 1999), that "[i]t is the nature of the debt owed, not the identity of the payee, that governs whether a debt is support." *Id.* at 564. In *Cribb v. Cribb (In re Cribb)*, 34 B.R. 862 (Bankr.D.S.C.1983), the court rejected the argument that payments to third parties fell outside the realm of § 523(a)(5):

The fact that the debtor will, in all probability, pay the bank directly, rather than

through his former wife, has no material bearing on the nondischargeability of the debt. Divorce decrees often provide for debt assumption in lieu of, or as part of, alimony, support, or maintenance. It is frequently inconvenient or impractical to require the debt to be paid through the spouse rather than directly to the creditor. *Id.* at 865 (citations omitted), *quoted in Burns v. Burns (In re Burns)*, 186 B.R. 637, 642 (Bankr.D.S.C.1992).

**10.** *See, e.g., Polishuk v. Polishuk (In re Polishuk)*, 243 B.R. 408, 419 (Bankr.N.D.Okla. 1999) ("This Court concludes that the purpose behind requiring Mr. Polishuk to pay the Credit Card Debt was to ensure that Ms. Polishuk would not have to pay the same, and to ensure that her income would be available to pay her expenses and service her debts."); *Krein v. Hanagan (In re Krein)*, 230 B.R. 379,

In *Luman v. Luman (In re Luman)*, 238 B.R. 697 (Bankr.N.D.Ohio 1999), the court noted that once an actual need for support is established, "the state court is conclusively deemed to have intended for the payment of the debt to have been in the nature of support." *Id.* at 708. In concluding the credit card debt to be in the nature of support, the *Luman* court stated "it seems clear to the Court that any increase in the Plaintiff's monthly expenses could have dire consequences on the Plaintiff's ability to provide for the basic necessities for herself and her child." *Id.* at 709–10.

Similarly, in *In re Armento*, 127 B.R. 486 (Bankr.S.D.Fla.1991), the court addressed an agreement in which the spouse waived alimony and the debtor assumed the credit card debts. *Id.* at 490. In analyzing the dischargeability of the credit card debts, the *Armento* court noted that "at the time the waiver was made, the creditor [spouse] did not contemplate being placed in the untenable position of having to pay for the credit card debts incurred by the debtor." *Id.* The court therefore found the credit card debt to be nondischargeable under § 523(a)(5) because "[a]bsent the hold harmless agreement, the support payments made by the debtor to the creditor pursuant to the settlement agreement would be rendered ineffectual," *id.*, and "would not provide the support the parties contemplated ... at the time the settlement was executed, if the creditor is now obligated to pay for the [credit card] debts, ...." *id.*

*Dewey v. Dewey (In re Dewey)*, 223 B.R. 559 (10th Cir. BAP 1998), *aff'd*, 202 F.3d 281, 1999 WL 1136744 (10th Cir.1999), presents facts very similar to the instant case. In *Dewey*, the debtor assumed various obligations in a property settlement agreement with his former wife, including credit card obligations. *See id.* at 561–62 & n. 2. Following entry of the divorce decree, the debtor filed for protection under Chapter 13 and submitted a Chapter 13 plan. *Id.* at 562. The debtor's former wife subsequently objected to confirmation of the debtor's plan because the plan did not treat her claim as a priority claim pursuant to § 1322(a)(2). *Id.* In affirming the bankruptcy court's denial of plan confirmation, the Bankruptcy Appellate Panel of the Tenth Circuit Court of Appeals endorsed the finding that the payment of the debts was designed "to relieve Dewey of any joint obligation on the debts so as to allow her to use her limited income to support herself." *Id.* at 566.

This Court's review of the relevant case law in this area demonstrates a common

---

386 (Bankr.N.D.Iowa 1999) (concluding that the debtor's assumption of credit card debt was in the nature of support, the court stated: "Considering the parties' financial disparities, the Court concludes Debtor's assumption of the marital debts functioned to allow Ms. Hanagan to afford basic necessities."); *Ianke v. Ianke (In re Ianke)*, 185 B.R. 297, 301 (Bankr.E.D.Mo.1995) (holding promise to indemnify for credit card debts to be nondischargeable support obligation in part because if the spouse "were to pay the credit card and attorney's fee debts from this monthly income, her ability to meet the regular monthly family expenses would be severely impaired"); *Schurman v. Schurman (In re Schurman)*, 130 B.R. 538, 539 (Bankr.

W.D.Mo.1991) (discharging credit card debts in part because spouse had no liability on the debts and therefore her well being would be unaffected); *In re Brand*, 108 B.R. 319, 321 (Bankr.N.D.Ala.1989) ("Thus, if the obligation to make payments on the four other credit-card accounts were thrust upon her by the debtor's discharge in bankruptcy, it is apparent that her monthly-budget deficit would be greatly multiplied and that her ability to support and maintain herself would be substantially and materially impaired and put in disarray."); *Kubicek v. Eikenberg (In re Eikenberg)*, 107 B.R. 139, 142 (Bankr.N.D.Ohio 1989); *Sermersheim v. Sermersheim (In re Sermersheim)*, 97 B.R. 885, 891 (Bankr.N.D.Ohio 1989).

theme, as articulated in *Borzillo v. Borzillo (In re Borzillo)*, 130 B.R. 438 (Bankr. E.D.Pa.1991):

> [W]e believe that there is a greater degree of consistency in these "credit card" decisions than appears at first blush. All of the decisions which found and focused upon financial disparities between the spouses considered the credit card debt payments to be alimony. Cases which focused upon and found no financial disparity between the parties considered the debts to be property distributions. Finally, cases which did not focus at all on the parties' financial disparity reached variant results based exclusively on the texts of the respective agreements alone.

*Id.* at 448 (citations omitted).[11] In the case before this Court, disparity in income between Austin and Brunson is highly relevant in part because the text of the Agreement alone cannot form the basis for this Court's decision. Although the Agreement attempts to categorize all the obligations contained therein as support duties, this Court cannot be bound by the four corners of the Agreement. Although the language of the Agreement is significant, this Court should look to "a variety of sources." *In re Taylor*, 252 B.R. 346, 352 (Bankr. E.D.Va.1999). The language of the Agreement in the instant case is less compelling than it might be under normal circumstances because the Agreement largely plagiarizes an earlier separation agreement from a different marriage. Moreover, no attorneys assisted in reviewing the Agreement as it applied specifically to Brunson and Austin. The parties simply decided to save legal expense and attempt to apply an Agreement drafted for another divorce to their own circumstances. To discern the parties' true intent, this Court finds it necessary to look beyond the four corners of the Agreement.

Turning to the financial disparity between the parties, this Court finds the disparity to be great. At the time of the Agreement, Austin earned nearly $2000 more a month than did Brunson. As to the Consolidation Loans, they consist of debt that Austin incurred prior to his marriage to Brunson. Brunson only became obligated on this debt in an attempt to obtain a lower interest rate for Austin. Not only is it clear that Austin's agreement to pay the Consolidation Loans was an attempt to balance the disparity in income, it is equally apparent that to allow Austin to avoid this debt at the expense of Brunson's daily needs would be highly inequitable.

The Credit Card Bills are more difficult because several charges on the credit cards were for items of personal property that Brunson purchased and retained pur-

---

11. The Court has encountered two cases that appear to be at odds with the majority of the case law. In *Winn v. Winn (In re Winn)*, 95 B.R. 839 (Bankr.S.D.Fla.1988), the spouse testified that based on her financial condition, she would have to use "support funds" to pay the debtor's credit card obligations if the debtor received a discharge of those debts. *Id.* at 840. In response, the court curiously noted that "it is beyond this court's authority to make an investigation of the spouses's circumstances to determine the appropriate measure of need or support." *Id.* Just as surprising, in *Lane v. Lane (In re Lane)*, 147 B.R. 784 (Bankr.N.D.Okla.1992), the court concluded that "[p]aying unsecured debts to banks and credit card companies does not help to provide any of the necessities of life to the ex-spouse." *Id.* at 787. Despite *Winn* and *Lane*, the case law is overwhelming that the finances of the spouses at the time of the separation agreement or divorce decree, and the effect on the spouse if the debtor discharges his credit card obligations, are both highly relevant considerations. To the extent *Winn* and *Lane* disagree with the importance of these two factors, this Court rejects such reasoning as illogical and contrary to the great weight of case law in this area.

suant to the Agreement. Indeed, some of the purchases were luxuries, such as two horses and various horse equipment or supplies. Whether the purchases were for luxuries or necessities, however, is not the principal issue before this Court. What this Court must decide is whether the decision to obligate Austin for all of the Credit Card Bills was intended to be in the nature of support. That is, even if all of the purchases were for luxuries for Brunson, if Austin assumed those debts to provide support for Brunson by allowing her to meet her support needs, then the debt is in the nature of support and therefore a priority claim. In *Borzillo*, the court acknowledged this point:

> [T]he issue of whether the purchases made were for luxuries or necessaries is not the same as the truly relevant issue of whether the Wife will *now* be deprived of necessaries if the payments are not made.... However, more significant is the fact that, even after he was fully aware of the balances on all of these charge accounts, the Husband agreed to pay for them under the terms of the Agreement.

*Borzillo*, 130 B.R. at 446, 447. Such is the case here, as Austin agreed to assume the Credit Card Bills and the Consolidation Loans with full knowledge of their balances and the underlying purchases. Given the large disparity in income between the parties, the assumption of these debts appear to be an attempt to balance that income disparity. As such, the Court finds that the debt serves to allow Brunson the opportunity to use her own income to meet her daily needs, such as housing and transportation. Such a purpose is clearly in the nature of support and therefore the debts regarding the Credit Card Bills and Con-

solidation Loans are in the nature of support. Pursuant to § 507, the claim is entitled to full payment as a priority claim. Because the Chapter 13 plan does not provide for the payment in full of this portion of the Brunson Claim, plan confirmation must be denied.

### III. PERSONAL INJURY SETTLEMENT

■ Having denied confirmation, the Court still must address whether the entire Brunson Claim is entitled to priority status. If the agreement to pay 25% of the Virginia Lawsuit proceeds is not in the nature of support, then it is not entitled to payment in full as a priority claim. Because Austin has objected to the Brunson Claim, this aspect of the objection must be addressed despite the denial of plan confirmation.

Whether an agreement to pay a percentage of any proceeds awarded from a lawsuit may be a debt in the nature of support is a novel issue. The facts in *Garza v. Garza (In re Garza)*, 217 B.R. 197 (Bankr. N.D.Tex.1998), most closely resemble the facts of the instant case. In *Garza*, the Final Decree of Divorce entered by the Judicial District Court of Bexar County, Texas, contained a provision obligating the debtor spouse to pay a portion of any judgment or settlement he might receive in his then pending lawsuit against Oscar de La Hoya.[12] *Id.* at 199. Specifically, the decree obligated the debtor to pay "fifty percent (50%) of the first $50,000 and sixty percent (60%) of the second $50,000 received...." *Id.* Like the instant case, the bankruptcy court in *Garza* had to decide whether such a divorce-related obligation was in the nature of support. In its analysis, the court considered several factors,

---

**12.** Oscar de la Hoya is a former World Boxing Council lightweight, super lightweight, and welterweight world champion.

including the labels in the divorce decree, the parties' income and needs at the time the obligation became fixed, the division of property, the method of payment and the ability to change the payments. *See id.* at 201–03. The court concluded that the debt was not in the nature of support, but rather "a familial property obligation." *Id.* at 203. The court noted that it based its conclusion primarily on the number and frequency of payments. *See id.* at 203. In consideration of this factor, the court noted that "[l]imited payments over a short period are more likely to be considered property settlement than support; whereas, sums paid in monthly increments over an extended period of time are indicative of support." *Id.* The court quoted *Matter of Bailey,* 20 B.R. 906 (Bankr.W.D.Wis.1982):

> "In the present case, the award of $23,100 cannot be considered alimony, maintenance or support. The form of the award is more consistent with a property division than support. The award was to be paid as a lump sum, it was not made terminable on death or remarriage and it was labelled a property settlement by the divorce court."

*Garza,* 217 B.R. at 203 (quoting *Bailey,* 20 B.R. at 910).

As in *Garza,* the Court here is strongly influenced by the method of payment. Originally, the Agreement would have provided a $200,000.00 lump sum payment to Brunson. Austin declined this arrangement, but ultimately agreed to pay 25% of whatever proceeds he might be awarded. The fact that the payment was to be made in lump sum and for no certain amount, but rather based on a percentage, strongly suggests this obligation was a property settlement between the parties regarding a future interest. Austin would only have to pay this obligation if he obtained any monies from the Virginia Lawsuit. This arrangement stands in stark contrast to the provision regarding the Credit Card Bills and Consolidation Loans. Had he received nothing from the Virginia Lawsuit, Austin still would have been obligated under the Credit Card Bills and Consolidation Loans. Austin, however, would have no obligation concerning the promise requiring payment of 25% of the Virginia Lawsuit proceeds. Had such an obligation been intended to provide for support, it is unlikely that it would be paid as a lump sum and most certainly would not be in terms of a percentage. By leaving it as a percentage, Brunson risked receiving nothing should Austin's lawsuit fail.[13] Thus, it could not have been intended as support, but only as the division of property should such property come to fruition. A property settlement is not in the nature of support and therefore not entitled to priority status. Accordingly, as to the Virginia Lawsuit proceeds only, this Court sustains Austin's objection to the Brunson Claim.

## IV. GOOD FAITH IN FILING CHAPTER 13 PLAN

Thus far, the Court has concluded that any Chapter 13 plan proposed by Austin must pay the remaining portion of the Credit Card Bills and Consolidation Loans in full as a priority claim. Any subsequent plan that fails to make such provision will fail. The Court has also concluded that

---

**13.** Despite Brunson's testimony that the purpose of the payment of 25% of the proceeds of the Virginia Lawsuit was to buy her a vehicle and a house, it appears likely that the true purpose was to elevate Brunson's premarital and marital living standard, rather than to provide support. *Cf. Smith v. Smith (In re Smith),* 131 B.R. 959, 970 (Bankr.E.D.Mich. 1991) (concluding that the $25,000 award was not support, but rather "was designed to provide her daughter with the kind of lifestyle befitting a doctor's daughter, from which I infer a level of support substantially higher than that envisioned by *Calhoun* ").

the portion of the Brunson Claim regarding the 25% payment of the Virginia Lawsuit proceeds is not entitled to priority treatment. A plan, however, that attempts to discharge such debt may subject the plan to a denial of confirmation on the basis that the plan was not filed in good faith. Although the Court need not reach this issue today, because it has already denied confirmation for reasons previously addressed, the issue merits some preliminary treatment as to how it relates to the Court's ruling today.

Having decided that the Virginia Lawsuit proceeds are not in the nature of support as understood in §§ 523(a)(5) and 507(a)(7), the Court has not determined whether the property settlement would be nondischargeable under § 523(a)(15). Although this case is proceeding under Chapter 13, the analysis of § 523(a)(15) could be relevant in the Court's consideration of whether Austin has filed the Chapter 13 plan, or any subsequent plan, in good faith. *See* 11 U.S.C. § 1325(a)(3) (2001) ("[T]he court shall confirm a plan if ... the plan has been proposed in good faith and not by any means forbidden by law."). In *Dewey v. Dewey (In re Dewey)*, 223 B.R. 559 (10th Cir. BAP 1998), *aff'd*, 202 F.3d 281, 1999 WL 1136744 (10th Cir. 1999), the court discussed how the issue might arise:

> In a Chapter 13 case, the debt described in § 523(a)(15) is not a nondischargeable obligation under § 1328(a)(2), nor is it a priority obligation required to be paid under § 1322(a)(2). The only relevance the existence of § 523(a)(15) debt has in relation to confirmation of a Chapter 13 plan is in the determination of whether the Chapter 13 plan has been proposed in good faith as required by § 1325(a)(3).

*Id.* at 566 (citing *Flygare v. Boulden*, 709 F.2d 1344, 1347–48 (10th Cir.1983) for the proposition that the nondischargeability of a debt is a factor to consider in the context of good faith).

In *Deans v. O'Donnell*, 692 F.2d 968 (4th Cir.1982), the Fourth Circuit Court of Appeals established a non-exclusive list of factors to consider in determining whether a debtor has filed a Chapter 13 plan in good faith. *See id.* at 972. Those factors include "the percentage of proposed repayment, ... the debtor's financial situation, the period of time payment will be made, the debtor's employment history and prospects, the nature and amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing facts, and any unusual or exceptional problems facing the particular debtor." *Id.* In *Neufeld v. Freeman*, 794 F.2d 149 (4th Cir.1986), the Fourth Circuit noted some additional factors, including the pre-filing conduct of the debtor and the nondischargeability of a debt if the case were proceeding under Chapter 7. *See id.* at 152. The court in *Neufeld* did note, however, that "the discharge of an obligation which would be nondischargeable in Chapter 7 is not, standing alone, a sufficient basis on which to find bad faith or deny confirmation...." *Id.*

The Court leaves this issue for another day because the Court has already denied confirmation of Austin's plan based on its failure to pay the Credit Card Bills and Consolidation Loans in full. Under Local Bankruptcy Rule 3015–2(C)(2), Austin must file an amended Chapter 13 plan within ten days of the order denying confirmation or suffer dismissal of his case. Should Austin elect to file an amended plan treating the portion of the Brunson Claim regarding the Virginia Lawsuit proceeds as an unsecured nonpriority claim, the Court then should consider whether such an amended plan is filed in good faith, taking into account the totality of the circumstances, including the non-exclusive factors set forth in *Deans v. O'Donnell* and *Neufeld v. Freeman*. Until such an

amended plan is forthcoming,[14] the denial of confirmation for the reasons expressed here inevitably moots the objection ground of Brunson that the plan of Austin is not filed in good faith, as the existing plan with its current provisions will not be confirmed.

### V.

For the reasons stated above, the Court SUSTAINS the Objection to Confirmation of the debtor's Plan and SUSTAINS IN PART the debtor's Objection to Priority Claim. Accordingly, plan confirmation is DENIED and that portion of the Brunson Claim regarding the unpaid portion of the Credit Card Bills and Consolidation Loans is treated as a priority claim.

IT IS SO ORDERED.

---

**14.** The Chapter 13 Trustee also objected to plan confirmation at the April 6 hearing. After hearing the trustee's objection, this Court sustained the objection and denied plan confirmation. The Court entered an order denying confirmation on April 11, 2001, but allowed Austin fifteen days to file an amended plan. In response, Austin filed an amended plan on April 26, 2001. With respect to the Brunson Claim, the amended plan continues to treat it as an unsecured, nonpriority claim. In light of this Court's pending decision, Brunson has moved to extend the time for objecting to Austin's plan to twenty days beyond the date of this decision. A hearing on Brunson's motion is currently scheduled for July 13, 2001.